**Samuel MANEVICH, Plaintiff,**

v.

**Francis I. duPONT et al., Defendants.**

**No. 70 Civ. 5680.**

United States District Court,
S. D. New York.

Feb. 28, 1972.

---

Carro, Spanbock & Londin, New York City, for plaintiff; by Kenneth A. Lapatine, New York City, of counsel.

Lunney, Downey & Crocco, New York City, for defendants; by J. Robert Lunney, New York City, of counsel.

POLLACK, District Judge.

The plaintiff sues herein to recover losses sustained in margin trading in securities. The defendants are the stock brokers, members of the New York Stock Exchange, through whom the transactions were effected, and their registered representative who handled plaintiff's account. The case was tried to the Court without a jury on agreed upon findings of fact and on the oral and deposition testimony of employees of the brokerage firm. The plaintiff did not testify although he was present throughout the trial.

The sole claim tried is that the defendants permitted the plaintiff to purchase securities on margin in violation of the margin requirements imposed by Regulation T of the Federal Reserve System, 12 C.F.R. § 220, promulgated pursuant to Section 7 of the Securities Exchange Act of 1934, 15 U.S.C. § 78g.[1]

The background is as follows.

Plaintiff was a margin trader in securities prior to 1969 and was the holder of a considerable number of speculative issues. On or about January 6, 1969, plaintiff opened a new margin account with the defendant brokerage firm through the individual defendant, one of its registered representatives, and instructed the transfer of his entire margin account maintained with other brokers to the defendant firm. The transferred account contained 8,757 shares of the stock of 26 different companies held as collateral security for an indebtedness to the former brokers of $36,713.64 which the defendant firm paid to the transferor on plaintiff's behalf.

1. A second count for violation of the antifraud provision in Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5 is dismissed on consent of plaintiff given at the opening of trial.

In connection with opening the new account, plaintiff signed the defendants' usual customer's margin trading agreement, by which he undertook at all times to maintain margin in his account as required by the brokers from time to time. During the period that plaintiff maintained his account with defendants, the maintenance requirement set by the defendants called for a margin of 30% of the market value of the securities carried in a customer's account. This house rule required a higher margin than the 25% minimum which the Rules of the New York Stock Exchange required its members to prescribe as maintenance margin. Rule 431, New York Stock Exchange Guide, ¶ 2431 (1957).

Following the opening of his account, the plaintiff bought and sold securities therein, deposited cash as additional collateral, received dividends in the account from securities on hand, was debited with the cost of securities purchased and charged interest on the money balances owing to the brokers. He regularly received monthly statements of all transactions.

During 1969, plaintiff made 19 stock purchases on which he claims to have sustained an actual or paper loss in 1969 through 1971. He seeks to shift this loss to the brokers in this suit. These purchases involved 2,900 shares of the securities of 16 different corporations. In August, 1970, plaintiff's account fell below the 30% minimum margin which he was obligated to maintain. Sales of securities in the account were effected, resulting in the credit to the account of proceeds which were less than the cost to the plaintiff of the securities sold. By this suit plaintiff seeks also to recover this difference from the brokers.

This suit was commenced on December 23, 1970.

Regardless of the motivation of a customer who sues his agent for trading losses derived from unlucky speculation, it has been held that the customer has a right to seek damages resulting from purchases made in violation of Regulation T. Pearlstein v. Scudder & German, 429 F.2d 1136 (2d Cir. 1970). Such holdings are deemed to be required as a means of protecting the public from margin violations by brokers and dealers. *Idem* 1140. Consequently, a detailed analysis must be made to determine whether plaintiff's "buying power" in his accounts used to effect each of the purchases equalled the minimum initial margin requirement of 80% imposed in 1969 by Regulation T. A detailed scrutiny of the margin situation in plaintiff's accounts at the time of each purchase shows that there were free funds on hand with the brokers sufficient to meet the 80% initial margin requirement in every instance. Plaintiff's contentions to the contrary lack merit.

Plaintiff attempted to show that each of the transactions in issue was undermargined in violation of Regulation T, by use of the stipulated figures describing a) the value of the collateral in plaintiff's account and b) the debit balance due the brokers on the days of each purchase. He concluded two things from these two figures: 1) that the extent of margin legally available to make a purchase was 20% of the value of the collateral in his account; and 2) that since the existing indebtedness to the brokers in plaintiff's account was in excess of 20% of the aggregate market value of the collateral in the account, there was no "buying power" to meet initial margin requirements for the new purchases.

However, the source for satisfying Regulation T was not the securities existing in the account but a Special Miscellaneous Account, a type of memorandum account employed not only by these brokers for each of their customers but by virtually all other brokerage firms as well.

The Special Miscellaneous Account, or SMA as it is popularly known, is an account which contains and from which is drawn, by an accounting transfer, the margin needed to comply with Regulation T whenever a purchase of se-

curities is made partly on credit. The available credit balance in the SMA consists of cash deposited by the customer, dividends on securities held by the broker for the customer's account, any available portion of the sales proceeds of securities sold in the margin account by the customer,[2] and any appreciation in market value of the securities held in the account over the price at which they were purchased.[3]

Table I of the Appendix hereto, sets out, pursuant to stipulation, the history of plaintiff's SMA from just before the first transaction in question, dated March 11, 1969,[4] through the last transaction on December 11, 1969. Table I indicates that credit in the SMA was available (column 5) and did provide (column 3) the 80% initial margin required for each of the transactions in question. This table also indicates the extent of the credits to the SMA during this period and their sources, i. e. cash dividends, cash deposits, and proceeds available on sales of securities.

The issue briefed by the parties concerns the propriety of the use which the brokers made of the SMA in handling the plaintiff's accounts. The legal arguments of both parties center on the question of how the Special Accounts provision of Regulation .T applies to this case, particularly the subsection entitled *Special miscellaneous account*, 12 C.F.R. § 220.4(f). The plaintiff contends that this subsection precludes the brokers from applying SMA credits to achieve the initial margin required under Regulation T for each transaction. The defendants contend to the contrary.

Plaintiff asserts that the practice in question is covered by 12 C.F.R. § 220.4(f) (8), and he concludes that the practice is illegal because the credit in the SMA is used for the purpose of "purchasing or carrying or trading securities."[5] In the alternative, apparently, plaintiff contends that the practice is covered by 12 C.F.R. § 220.4(f) (6), but is illegal under that subsection because the credit in the account is extended as a loan and not as an outright

2. The available proceeds in a so-called "restricted account" are the difference between the sales price and the retention requirement of 70% of the current market value of the security sold. A restricted account is one which would have an excess of adjusted debit balance over loan value of securities following a withdrawal of cash or securities. 12 C.F.R. § 220.8(e) (1) (Revised as of January 1, 1969).

3. That part of the SMA attributable to appreciation of the value of a security over the price at which it was purchased remains, according to the brokers, available even after a subsequent drop in the market price of that security. The theory underlying the maintenance of that part of the SMA in the face of such a drop is based on the fact that at the time of appreciation a customer may draw upon his SMA account in cash, if he desires, to the extent of the appreciation. In that instance a subsequent drop would not require a return of these funds under Regulation T. The theory is that in the case where the customer leaves the appreciated value undisturbed in his

SMA, the customer should not be treated any differently, that is, a subsequent depreciation should not result in a debit to that extent.

The legality of the use of this component of the SMA under Regulation T is not, however, in issue here. No part of the plaintiff's SMA, as analyzed herein, is attributable to appreciation.

4. The value of the securities in the account, the collateral for the indebtedness to the brokers, was about $121,469 on or about March 1, 1969. The debit balance at that time, reduced from the original amount by collection of proceeds of sales in the interval, was $33,876.21.

5. 12 C.F.R. § 220.4(f) (8) provides:
   (f) Special miscellaneous account. In a special miscellaneous account, a creditor may:
      \*    \*    \*    \*    \*
   (8) Extend and maintain credit to or for any customer without collateral or on any collateral whatever for any purpose other than purchasing or carrying or trading in securities.

payment.[6] Defendants respond with the assertion that "Plaintiff's reliance on 220.4(f) (6) and (8) is unfounded as these provisions apply to non-purpose loan accounts—that is where the customer withdraws money for purposes other than the purchase of securities".

■ The suggestion is offered on defendants' behalf that 12 C.F.R. § 220.4(f) (1) supplies the basis for transfers of credit from the SMA to cover the margin purchases. That regulation authorizes use of credit in the SMA "to meet the emergency need of any creditor." Self-evidently, however, there is no emergency to a practice maintained by brokers on a day-to-day or transaction-to-transaction basis. Consequently, we may not look to § 220.4(f) (1) as the basis for an accounting transfer to make up the initial margin requirements on purchases.

■ The regulation which does ground the use of SMA credit for purposes of complying with Regulation T in margin purchases is § 220.4(f) (6). This, in pertinent part, reads as follows:

> In a special miscellaneous account, a creditor may: (6) . . . [P]ay out or deliver to or for any customer, any money or securities. (Emphasis supplied.)

If a broker can "pay out" to a customer "any money" the customer has in his SMA, then the broker can "pay out" that value to any other account of the customer, including a margin account, instead of simply handing over the cash. Thus the analogy to a bank account, pressed by the brokers, is fairly accurate.

■ The plaintiff is in no position to protest surprise in view of the following notice on every page of every monthly statement received by plaintiff:

> If this is a margin account this is a combined statement of your General Account and of a Special Miscellaneous Account maintained for you under Section 4(f) (6) of Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent record of the Separate Account as required by Regulation T is available for your inspection upon request.
>
> Funds represented by any free credit balance in your account . . . are not segregated and may be used in the operation of the business of F. I. duPont, Glore Forgan & Co., in any type of account. However, such funds are payable to you on your demand.

■ The technical issue of whether the SMA can be used as a repository of customer's "buying power" obscures, however, the central issue of whether the credit in the SMA constitutes "buying power" employable without violation of initial margin requirements. There can be no question that credit for dividends and cash advanced by the customer represents valid buying power. In this case, only two further questions remain. One concerns the validity of crediting to the SMA part of the proceeds from the sale of margined securities. The other involves the problem of substituting margined securities by purchase and sale on the same day.

■ The retention provision of Regulation T in effect at the time of the transactions in question required that 70% of the proceeds of a sale of a security, where that sale would result in an excess of the adjusted debit balance over the (30%) loan value of the securities held in the account, be retained in the

---

6. 12 C.F.R. § 220.4(f) (6) provides:
    (f) Special miscellaneous account. In a special miscellaneous account, a creditor may:
    *       *       *       *    ·    *
    (6) Effect for any customer the collection or exchange (other than by sale or purchase) of securities deposited by the customer specifically for such purposes, and (subject to any other applicable provisions of law) receive from or for any customer, and pay out or deliver to or for any customer, any money or securities.

account and not applied to the purchase of new securities. 12 C.F.R. § 220.8(e) (1) (Revised as of January 1, 1969). This, however, freed 30% of the proceeds of the sale to the customer's use. The use of that value in margin purchases was valid and consistent with Regulation T. *See* 2 L. Loss, Securities Regulation 1250, n. 37 (1961, Supp. 1969).

The analysis of the SMA set out in Table I shows certain same-day purchases and sales of margined securities. Where a purchase and a sale of securities have been made on the same day by a customer, then those two transactions will be cleared under the Exchange rules, that is settlement will be made, on the same day, five business days after the purchase and sale. The net effect is that the account of the customer is credited or debited by the amount of the difference between the buy and the sell. Thus, the margin requirement, when there are purchases and sales on the same day, is a requirement that the *difference* between the buy and the sell be margined at the appropriate percentage, in this case 80%.[7] 2 L. Loss, Securities Regulation, *supra.*

Plaintiff bases his contention that a pay-out from the SMA is an illegal loan on the fact that whenever the SMA is credited (as a result of a cash deposit, for example), the customer's debit balance is also reduced by that amount.[8] Plaintiff asserts that these uses of credits in effect provide two dollars for margin trading purposes for every dollar supplied by the customer and moreover, that the "extra" dollar so used constitutes an illegal loan. These contentions are a tissue of confusion.

Underlying the plaintiff's confusion is the failure to give effect to the distinction between *initial* margin requirements under Regulation T and *maintenance* margin requirements which stem from the credit terms on which a margin account will be carried by a brokerage house pursuant to its own house rules, or alternatively, the Exchange's minimum requirement of margin. The amount of the customer's permissible debit balance is related to the question of compliance with maintenance requirements, not to initial margin requirements. In this case, in addition to showing the sufficiency of initial margin for the purchases in question, the brokerage firm's figures comparing the value of the securities long in the account with the customer's debit balance, from time to time, demonstrated that the maintenance margin requirements were also met in plaintiff's account.[9]

The proof unequivocally demonstrates that each of the 19 purchases in ques-

---

7. See Table I, transactions for the dates of March 28, April 1, 11, May 7, July 8, August 20, 22, October 14, November 10, 12 and December 8, 1969. Table I indicates that this difference was properly margined in each buy-sell transaction in question by credit transfer from the SMA.

8. Plaintiff did not deny duPont's contention that whenever money is received to meet a call, the debit balance will be reduced but no SMA will be forthcoming.

9. Defendants adduced evidence as to the effect on the debit balance and the SMA as to each transaction in question. For example, the transaction of March 11, 1969, developed as follows:

1. Plaintiff's Account

| | |
|---|---:|
| Market Value | $129,744.00 |
| Debit Balance | 44,033.00 |
| Equity | $ 85,711.00 |
| 30% Maintenance Requirement | 38,923.00 |
| Excess over house requirement | $ 46,788.00 |

2. New Purchases

| | |
|---|---:|
| Buy 200 Granite | $ 7,223.76 |
| 100 Gulton | 2,933.50 |
| | $ 10,157.26 |
| | x 80% |
| Required margin—Regulation T | $ 8,125.00 |

3. *Source of Compliance—Regulation T*

| | SMA |
|---|---:|
| Prior to trade | $ 19,651.00 |
| Less: | 8,125.00 |
| After trade | $ 11,526.00 |

tion met the requirements of and did not violate Regulation T. Accordingly, the complaint is dismissed, with costs.

The foregoing, together with the footnotes and Appendix hereto and the agreed findings of the parties, shall constitute the findings and conclusions required to be set forth by F.R.Civ.P. 52(a).

So ordered.

## APPENDIX

### TABLE 1 ①

| DATE | DISPOSITION | DEBIT (SMA) | CREDIT (SMA) | SMA |
|---|---|---|---|---|
| 3/6/69 | | | | $ 1965. |
| 3/11/69 | B-200 Granite | $ 7223.76 | | |
| | B-100 Gulton | 2933.50 } $ 8125. | | 11526. |
| 3/12/69 | Cash Div. 200 Sprague | | 20. | 11546. |
| 3/18/69 | Cash Div. 100 Continental | | 75. | 11621. |
| 3/20/69 | Cash Div. 104 Pittway | | 15 | 11636. |
| 3/26/69 | Cash Div. 100 Kansas | | 50 | 11686. |
| 3/28/69 | B-100 U.S. Smelting | 4428.44 | | |
| | S-100 Pittway | 3122.62 } 1045. | | 10641. |
| 4/1/69 | B-100 Sprague | 2216.38 | | |
| | B-100 Penn Central | 5481.94 | | |
| | S-100 Kansas | 4851.40 | 518. | 10123. |
| | S-300 United Foods | 2198.95 | | |
| 4/3/69 | Deposit $800. | | 800. | 10923. |
| 4/7/69 | Cash Div. 100 Penn. Cent. | | 60. | 10983. |
| 4/9/69 | Cash Div. 200 Cerro Corp. | | 80. | 11063. |
| 4/11/69 | B-100 Cities Serv. | 6207.66 | | |
| | B-100 Cities Serv. | 6220.18 } 1861. | | 9202. |
| | S-200 Mesa Pet. | 10101.59 | | |
| 4/14/69 | B-100 Allied Chem. | 3096.81 | | |
| | S-100 Gulton | 3035.55 } 49. | | 9153. |
| 4/15/69 | Cash Div. 12 Oxy. | | | |
| | 200 Pubco | | 32. | 9185. |
| 5/2/69 | Cash Div. 400 Barry W. | | 30. | 9.215. |
| 5/5/69 | S-200 Mesa Pet. | 9603.30 | 2881. | 12096. |
| 5/6/69 | B-200 Foxboro | 7073.00 | | |
| | B-400 North Cdn. | 5431.52 } 10 008. | | 2093. |
| 5/7/69 | B-400 Intl. Min. | 7552.52 | | |
| | S-100 Penn. Cent. | 5340.49 } 1762. | | 331. |
| 5/9/69 | Cash Div. 100 Ara Sec. | | 4. | 335. |
| 5/20/69 | Cash Div. 200 Compo. Ind. | | 16. | 351. |
| 5/26/69 | Deposit $54.86 | | 54. | 405. |

[A5312]

②

| 1<br>Date | 2<br>Disposition | | | 3<br>Debit<br>(SmA) | 4<br>Credit<br>(SmA) | 5<br>SmA |
|---|---|---|---|---|---|---|
| 5/27/69 | B- 300 | Volume | | 4755.39 } | | |
| | S- 700 | Equity | | 4524.49 } | 26 | 431. |
| | S- 50 | Equity | | 316.24 } | | |
| 5/29/69 | B- 100 | Con. Rac. | | 4843.00 } | | |
| | S- 100 | U.S. Smelt | | 4963.38 } | 36 | 467. |
| 6/4/69 | Adj. to SmA of #50. | | | | 50 | 517. |
| 6/5/69 | Adj. to SmA of #54. | | | | 54 | 571. |
| 6/9/69 | B- 300 | Pubco | | 5247.75 } | | |
| | S- 400 | North Con. | | 5847.36 } | 180 | 751. |
| 6/10/69 | Cash Div. | 100 | Allied Chem. | | 30 | 781. |
| 6/13/69 | Cash Div. | 200 | Cities Serv. } | | | |
| | | 200 | Cont. Oil } | | | |
| | | 200 | Oak Electro } | | 207 | 988. |
| 6/17/69 | Cash Div. | 300 | Sprague | | 30 | 1018. |
| 6/20/69 | Cash Div. | 100 | Penn Cent. | | 60 | 1078. |
| 7/8/69 | Cash Div. | 200 | Cerro Corp. | | 80 | 1158. |
| | B- 200 | New Cor. | | 4458.00 } | | 820 |
| | S- 500 | A.D. Ind. | | 4036.16 } | 338. | |
| 7/11/69 | Cash Div. | | Victoreen | | 4 | 824. |
| 7/22/69 | Cash Div. | 12 | Oxy. | | 3. | 827. |
| 7/31/69 | Cash Div. | 400 | Barry W. | | 30 | 857. |
| 8/4/69 | Cash Div. | 200 | Newcor | | 45. | 902. |
| 8/12/69 | Cash Div. | 300 | Volume | | 30 | 932. |
| 8/19/69 | Cash Div. | 200 | Compo Fnd. | | 16 | 948 |
| 8/20/69 | B- 100 | Victoreen | | 1092.75 } | | |
| | S- 2 | Bulova | | 63.10 } | | |
| | S- 12 | Oxy | | 413.16 | 258 | 690 |
| | S- 33 | Wilshire | | 293.27 } | | |
| 8/21/69 | S- 4 | Pittway | | 117.29 | 35 | 725 |
| 8/22/69 | B- 100 | Alloys | | 2883.25 } | | |
| | S- 100 | Barry W. | | 1992.70 } | 713 | 12. |

[A5313]

③

| 1 Date | 2 Disposition | 3 Debit (SMA) | 4 Credit (SMA) | 5 SMA |
|---|---|---|---|---|
| 8/29/69 | B- 100 Gulton | 2052.25 } | | |
| | S- 200 Barry W. | 4084.41 } | 610 | 622 |
| 9/2/69 | Cash Div. 200 Foxboro | | 30 | 652 |
| 9/8/69 | Cash Div. 200 Cities Serv. | | 100 | 752 |
| 9/10/69 | Cash Div. 100 Allied Chem. | | 30 | 782 |
| 9/15/69 | Cash Div. 200 Oak Electro } | | | |
| | 300 Sprague } | | 62 | 844 |
| 9/22/69 | Cash Div. 100 Con Rac. | | 15 | 859 |
| 9/24/69 | B- 100 Sprague | 2606.88 } | | |
| | S- 200 Oak Electro | 2799.94 } | 58 | 917 |
| 9/25/69 | Cash Div. 200 Cont. Oil | | 75 | 992 |
| 9/26/69 | Cash Div. 100 Penn. Cent. | | 60 | 1052 |
| 10/10/69 | Cash Div. 241 Cerro Corp. | | 96 | 1148 |
| 10/14/69 | B- 100 Granite } | 2531.50 } | | |
| | S- 100 Barry W. | 2215.45 } | 253 | 895 |
| 10/31/69 | Cash Div. 100 Barry W. } | | | |
| | 200 Newlar } | | 52 | 947 |
| 11/10/69 | B- 100 Goodrich } | 3423.44 } | | |
| | B- 100 SCM Corp. } | 2958.63 } | | |
| | S- 200 Cont. Oil | 5797.50 } | 467 | 480 |
| 11/12/69 | B- 100 Interphoto } | 1471.50 } | | |
| | S- 100 Intl. Min. | 1325.72 } | 117 | 363 |
| 11/17/69 | Cash Div. 200 Compo Ind. | | 16 | 379 |
| 11/18/69 | B- 300 Interphoto | 4490.25 } | | |
| | S- 300 Intl. Min. | 3977.16 } | 379 | -0- |
| 12/1/69 | Cash Div. 200 Foxboro | | 30 | 30 |
| 12/8/69 | B- 100 Barry W. } | 2279.50 } | | |
| | B- 200 Barry W. } | 4609.50 } | | |
| | S- 200 Foxboro } | 6518.86 } | 30 | -0- |
| 12/11/69 | TFR $266.00 from Cash A/c Vs F/C | | | |

◯ = PURCHASES COMPLAINED OF

[A53314]