**Gerald NEWMAN, Plaintiff,**

v.

**PERSHING & CO., INC. and L. M. Rosenthal & Co., Inc., Defendants.**

**No. 74 Civ. 4072 (WCC).**

United States District Court, S. D. New York.

April 4, 1975.

Rogers & Wells, New York City, for plaintiff; Roberta S. Karmel, New York City, of counsel.

Abraham L. Bienstock, New York City, for defendants.

## MEMORANDUM AND ORDER

CONNER, District Judge:

This is an action for a declaratory judgment that plaintiff, Gerald Newman, is not liable to defendants, Pershing & Co., Inc. (Pershing) and L. M. Rosenthal & Co., Inc. (Rosenthal), in any amount, under any circumstances, for his refusal to pay for 1,000 shares of the common stock of Electronic Arrays, Inc. (Arrays) which were allegedly purchased by plaintiff in October, 1973. Plaintiff additionally seeks a permanent injunction restraining defendants from attempting to recover any amount with regard to such alleged stock purchases.

Concurrent with service of the summons and complaint, plaintiff moved, pursuant to Rule 65, F.R.Civ.P., for a preliminary injunction staying the arbitration proceeding which has been initiated by Pershing before the New York Stock Exchange. Subsequently, defendants moved, pursuant to Rule 12(b), F.R. Civ.P., for an order dismissing the complaint for lack of subject matter jurisdiction and failure to state a cause of action.

The basis of this action and of plaintiff's motion is the contention that the matters in dispute involve violations of Regulation T, 12 C.F.R. § 220,[1] promulgated by the Board of Governors of the Federal Reserve System pursuant to Section 7 of the Securities Exchange Act of

---

1. Regulation T unquestionably covers the parties and transactions involved in this litigation. Defendants clearly come within the definition of "creditor" contained in Section 2(b) of Regulation T, and plaintiff qualifies as a "customer" under Section 2(c) thereof.

1934, 15 U.S.C. § 78g[2] (the Exchange Act) and therefore:

1) This Court has exclusive jurisdiction over this action, 15 U.S.C. § 78aa;

2) the purchase agreements are void, 15 U.S.C. § 78cc(b)(2);

3) any pre-existing arbitration agreement is void, 15 U.S.C. § 78cc(a).

This case presents a novel question concerning the scope of the private remedy for violations of Regulation T which has been implied under Section 29(a) of the Exchange Act. See *Pearlstein v. Scudder & German,* 429 F.2d 1136, 1140–41 (2d Cir.1970), *cert. denied,* 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971). That question is: Is a customer trading under a special cash account, 12 C.F.R. § 220.4(c), immune from any liability to a broker-dealer who seeks to recover all or part of the market loss on a transaction in which the broker-dealer failed to deliver or liquidate within the time limitation specified in Regulation T? Under the circumstances of this case, at least, I am constrained to rule that the answer is no.

## I.

The facts are essentially these: In October, 1973 plaintiff maintained a cash, C.O.D. account with Rosenthal for the purpose of purchasing securities. Under the terms of this account, as it existed in October 1973, plaintiff was to place orders with Rosenthal, who was to execute the trades as broker. Pershing's function was to "clear" each transaction, that is, to pay for the securities purchased from the sellers and to deliver them C.O.D. to a bank designated by plaintiff. It was also Pershing's responsibility to handle the bookkeeping on the transactions and provide plaintiff with confirmation slips and monthly statements of his account.

Initially, the designated bank was Underwriters Bank & Trust Co. (Underwriters). However, at some time subsequent to the establishment of plaintiff's account with Rosenthal in November 1972, but prior to October 1973, plaintiff transferred the designation to the American Bank & Trust Co. (American). It was during this same time period that Rosenthal arranged to have Pershing clear plaintiff's transactions. Pershing also agreed to maintain an account for plaintiff on a "disclosed" basis.

In accordance with this arrangement, plaintiff executed a Cash Account Agreement and a Standing C.O.D. Account Instruction Agreement to Pershing. The former contained the following clause:

"Any controversy between you and the undersigned arising out of or relating to this agreement, or the breach thereof, shall be settled by arbitration, in accordance with the rules, then obtaining, of either the Arbitration Committee of the Chamber of Commerce of the State of New York, or the American Arbitration Association, or the Board of Arbitration of the New York Stock Exchange, as the undersigned may elect."

On or about October 10, 1973, plaintiff ordered 500 shares of the common stock of Arrays from Rosenthal. These shares were delivered to American on November 9, 1973 and paid for. Defendants claim that plaintiff ordered additional lots of 500 shares of Arrays common on October 8 and 16, 1973. It was not until December 6, 1973 that Pershing attempted to deliver these shares to American,

---

**2.** Section 7(a) of the Exchange Act grants the Board of Governors of the Federal Reserve Board authority to establish regulations with respect to the amount of credit that may be initially extended and subsequently maintained on any registered security. 15 U.S.C. § 78g(a)

Section 7(c) of the Exchange Act makes it unlawful for "any member of a national securities exchange or any broker or dealer who transacts a business in securities through the medium of any such member" to extend, maintain, or arrange for the extension of credit except upon securities registered on a national securities exchange and then only according to the rules promulgated by the Federal Reserve Board. 15 U.S.C. § 78g(c).

which, pursuant to plaintiff's instructions, refused to accept delivery or to make payment.

Plaintiff denies having ever ordered the latter shares and asserts that upon learning of the alleged transaction he promptly so notified Rosenthal. Furthermore, plaintiff contends that, even if he had ordered the stock, its December 6, 1973 delivery date violated Regulation T and the purchase contracts are therefore illegal and void.

Defendants concede that the stock was not delivered to American until December 6, 1973, well after the time limit specified by Regulation T, but assert that the delay was the result of excusable error. It is defendant's position that in October 1973, Pershing's delivery instructions indicated that Underwriters was still plaintiff's designated bank and that shortly after the settlement dates of the three alleged purchases the certificates were delivered to Underwriters. However, in each case, the certificates were refused and returned to Pershing with the notation that plaintiff no longer dealt through Underwriters.[3]

It was not until November 9, 1973 that Rosenthal informed Pershing that plaintiff's agent bank was American. Pershing immediately delivered the 500 shares which represented the October 10 transaction to American. The shares were accepted and paid for. The certificates representing the alleged purchases of October 8 and 16, however, were not delivered at that time. Pershing claims that its margin clerk erroneously stapled the delivery tickets for those transactions to the delivery ticket for the October 10 trade and placed them all into the "accomplished" file.

As a result of this error, the certificates representing the October 8 and 16 trades were not delivered to American until December 6, 1973 when the margin clerk discovered the mistake. Delivery was refused pursuant to plaintiff's in-

structions and the certificates were returned to Pershing.

Defendants claim that on October 26, 1973 and November 28, 1973, plaintiff was sent monthly statements reflecting these trades and never objected to them. Plaintiff denies this and states that he cannot recollect receipt of any such statement and denies having knowledge that Arrays stock was ever delivered to Underwriters.

On December 20, 1973, Pershing sold out the 1,000 shares at a loss of $15,-924.94. Upon being notified of the sell-out, plaintiff wrote Rosenthal on December 28, 1973:

"I am in receipt of a confirmation from you today dated December 20, 1974. Having never authorized you to make a sale of 1,000 shares of Electronic Arrays, I do not acknowledge nor accept such trade. In addition, due to the inordinate time lapse of delivery of the original purchase of two 500 share lots of Electronic Arrays, I consider the contract for such sale null and void."

Pershing thereafter commenced an arbitration proceeding pursuant to the terms of the Cash Account Agreement, which led to this litigation.

## II.

As previously noted, the maintainability of this lawsuit depends upon the scope of the implied private remedies for violations of Section 7 of the Exchange Act and Regulation T promulgated thereunder. Plaintiff takes the position that the delay in delivery constituted a violation of the margin requirements of Regulation T and therefore the purchase contracts are rendered void and unenforceable pursuant to Section 29(b) of the Exchange Act. I cannot agree.

Section 29(b) provides in pertinent part that,

---

**3.** The certificates involved in the October 8, 10 and 16, 1973 transactions had settlement dates of October 15, 17 and 24. They were delivered to and returned by Underwriters on October 19, 24 and 25, respectively.

"Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract * * * the performance of which involves the violation of, or the continuance of any relationship in violation of, any provision of this [title] or any rule or regulation thereunder, shall be void * * *."

Despite the seeming all-inclusiveness of this language, I am unconvinced that the performance of an otherwise legal contract, contrary to its terms, in a manner which violates Regulation T, will render the contract itself void and unenforceable.[4] As Judge Friendly suggested in his dissent in *Pearlstein v. Scudder & German, supra* at 1149,

"Despite the Draconian language, § 29(b) does not provide a pat legislative formula for solving every case in which a contract and a violation concur. Rather it was a legislative direction to apply common-law principles of illegal bargain, enacted at a time when it seemed much more likely than it might now that courts would fail to do this without explicit legislative instruction. See *D. R. Wilder Manufacturing Co. v. Corn Products Refining Co.*, 236 U.S. 165, 174–75, 35 S.Ct. 398, 59 L.Ed. 520 (1915). There has been a conspicuous lack of judicial enthusiasm for the doctrine thus incorporated when there has been performance by the violator; the reasons are clearly set forth in *Bruce's Juices, Inc. v. American Can Co.*, 330 U.S. 743, 752–757, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947), and *Kelly v. Kosuga,* 358 U.S. 516, 519–21, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959)."[5]

Similarly, the Court in *Landry v. Hemphill, Noyes & Co.*, 473 F.2d 365, 370 (1st Cir.), *cert. denied*, 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973), ruled that, in order to obtain rescission under Section 29(b), the customer charging a violation of Regulation T should be required to demonstrate that it was the creditor's illegal offer of credit which induced him to purchase stock he would not have otherwise acquired. The same test should be applied in this case which seeks a declaratory judgment that the purchase contracts are void and unenforceable.

The purchase agreements involved herein were not entered into in violation of any provision of the federal securities laws. Moreover, their performance would not have involved any violation if Pershing had performed the contract pursuant to its terms. Any violation of Regulation T was apparently the result of human error, rather than any attempt to induce plaintiff to purchase securities he would not have otherwise acquired. Indeed, any violation of Regulation T came after the stock was purchased. Although defendants may be liable to

4. It has been suggested that Section 29(b) applies only to contracts that by their own terms violate the securities laws. See *Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 469 F.2d 1166, 1182, n. 25 (8th Cir. 1972); see, also, *A. C. Frost & Co. v. Coeur D'Alene Mines Corp.*, 312 U.S. 38, 42–44, 61 S.Ct. 414, 416, 417, 85 L.Ed. 500, 504–05 (1941), where the court thought it important that "the challenged contract bears no evidence of criminality and is fair upon its face * * *"; *Pearlstein v. Scudder & German*, 429 F.2d 1136, 1149 (2d Cir. 1970), cert. denied, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971) (Friendly, C. J., dissenting); *Gregory-Massari, Inc. v. Purkitt*, 1 Cal.App.3d 968, 82 Cal.Rptr. 210, 213 (2d Dist. 1969); *Billings Associates, Inc. v. Bashaw*, 27 A.D.2d 124, 276 N.Y.S.2d 446 (4th Dept.1967); 5 Loss, Securities Regulations 3307 (Supp.1969). In light of my ultimate disposition of this case, it is unnecessary to take a position in this controversy.

5. The proposition that an unintentional violation of Regulation T should not result in a rescission under Section 29(b) gains further support from Section 29(c), which reads:

"Nothing in this chapter shall be construed * * * to affect the validity of any * * * extension of credit * * * unless at the time of the making of such * * * extension of credit * * * the person making such * * * extension of credit * * * shall have actual knowledge of facts by reason of which the making of such loan * * * is a violation of the provisions of this chapter or any rule or regulation thereunder * * *." 15 U.S.C. § 78cc(c).

plaintiff for any damages proximately caused by the delay in delivery, a declaratory judgment that the purchase contracts are wholly void and unenforceable is inappropriate.

Congress never provided any express civil remedy for violations of Section 7 and Regulation T. This failure is understandable in light of the congressional committee report recommending the enactment of Section 7. That report indicates that the protection of individual investors from the dangers of excessive trading on credit was a purpose only incidental [6] to the main purpose which was the protection of the national economy by preventing speculation on credit from draining a disproportionate share of the nation's credit resources into the stock market. H.R.Rep.No. 1383, 73d Cong., 2d Sess. 7–9 (1934).

 Nevertheless, it has been ruled that customers have an implied right of action against creditors for violations of Section 7 and Regulation T. *Pearlstein v. Scudder & German, supra* at 1140.[7] Such private actions have been justified as

"a highly effective means of protecting the economy as a whole from mar-

gin violations by brokers and dealers." *Pearlstein, supra* at 1140.

These implied causes of action should be read in conjunction with the main purpose of Section 7, which is to protect the national economy, and should not be extended beyond the point where they support such purposes. See *Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 469 F.2d 1166, 1180 (8th Cir. 1972).

 To permit rescission or to declare the invalidity of contracts where the violations complained of are the result of accidental errors would do far more to impede than to promote the purposes of the federal securities laws. It would mean that every transaction which involves even an unintentional violation of the federal securities laws is voidable at the option of either party. This might well inspire investors to encourage relatively insignificant infractions so that they could merely cancel any losing transactions. As stated by Judge Friendly in his dissent in *Pearlstein, supra* at 1147–48:

"* * * I doubt whether permitting the customer to shift the risk of market decline to the broker is generally

---

**6.** The House committee went so far as to classify as "unimportant" considerations which do not affect the general national credit policy, but only the safety of a particular stock transaction. H.R.Rep.No. 1383, 73d Cong., 2d Sess. 8 (1934).

**7.** The continuing validity of *Pearlstein* has recently been questioned by Judge Tyler in *Bell v. Winer & Co., Inc.,* 392 F.Supp. 646 (S.D.N.Y.1975). In that case, Judge Tyler observed that, in finding an implied private right of action, the Court of Appeals had relied heavily upon the fact that,

"the federally imposed margin requirements forbid a broker to extend undue credit but do not forbid customers from accepting such credit. This fact appears to indicate that Congress has placed the responsibility for observing margins on the broker, for the original need for margin requirements undoubtedly derived from the common desire of investors to speculate unwisely on credit." 429 F.2d at 1141.

However, subsequently, Congress enacted Section 7(f) of the Exchange Act and the Federal Reserve Board promulgated Regulation X, 12 C.F.R. 224, pursuant thereto. The apparent effect of these new enactments was to make an investor equally responsible with a broker for observance of the margin requirements. *Bell v. Winer & Co., Inc.,* supra at 15; cf. *Tartell v. Chelsea National Bank,* 351 F.Supp. 1071 (S.D.N.Y.), aff'd, 470 F.2d 994 (2d Cir. 1972). Judge Tyler went on to conclude:

"Although § 7(f) and Regulation X are not aimed precisely at the instant type of situation, [See 2 U.S.Code Cong. & Admin.News 4409–10 (1970)] their existence certainly appears to undermine one of the primary supports of the *Pearlstein* rationale [and therefore] * * * while § 7(f) and Regulation X may not overrule *Pearlstein* they certainly indicate that the implied private right of action for violations of Regulation T should not be wantonly expanded." *Bell v. Winer & Co., Inc.,* supra at 15, 17–18.

either necessary or desirable as a means of furthering the primary purpose of § 7(c). Occasional and isolated violations of Regulation T do not threaten to cause a significant alteration in the allocation of credit in the economy; only widespread or repeated violations would pose a danger. But it is in just such situations that we may confidently expect application of the administrative and criminal sanctions provided by the Act. The economic purpose behind § 7(c) thus causes the provision to differ from those portions of the securities acts more directly aimed at the protection of investors.

\* \* \* \* \* \*

"Any deterrent effect of threatened liability on the broker may well be more than offset by the inducement to violations inherent in the prospect of a free ride for the customer who, under the majority's view, is placed in the enviable position of 'heads-I-win tails-you-lose'."

The majority opinion in *Pearlstein* does not impel a different conclusion. In that case, the plaintiff had purchased bonds on credit and was obligated under Regulation T to pay for them within seven business days after the date of purchase. The plaintiff defaulted and the defendant instituted a lawsuit to recover the balance due. A settlement was agreed upon, under which the plaintiff was given an extension of time to pay for the bonds. Once more, however, payment was not forthcoming and eventually the bonds were sold at a loss. The plaintiff sued, charging that the defendant violated the provisions of Section 7 by illegally extending credit to the plaintiff, and of Regulation T for failure to demand full payment from the plaintiff within the statutory time period.

The Court of Appeals held that the settlement did involve the promise by defendant of a continuation of credit which was illegal under the Exchange Act and therefore under Section 29(b) of the Exchange Act the stipulation was void.

The distinction between this case and *Pearlstein* is that there the settlement by its very terms authorized a continuing violation of federal law by granting an illegal extension of time to pay for the bonds. The settlement in effect attempted to legalize the very acts which the federal securities laws were enacted to prevent. Here, by contrast, the purchase agreements were not entered into with the expectation of illegally extending credit. Any violation of Regulation T was apparently the result of unforeseeable human error.

Although such a distinction may not preclude action by the Securities and Exchange Commission, or even an action by a customer to recover those damages proximately caused by an inadvertent violation of Regulation T, it should preclude an action to declare the contracts in suit absolutely void and unenforceable. Perhaps even a *de minimis* violation of Regulation T can be acted upon by the Securities and Exchange Commission under the enforcement provisions specifically provided for in the Exchange Act,[8] but surely every violation, no matter how small, should not result in a rescission under Section 29(b) and a private claim for the relief which has been implied thereunder. This would constitute an unjustifiable expansion of the implied cause of action for enforcement of Regulation T.[9]

Plaintiff's motion for a preliminary injunction is denied.

Defendant's motion to dismiss the complaint is granted.

SO ORDERED.

---

8. The SEC can deny, revoke or suspend a broker's registration under Section 15 of the Exchange Act, 15 U.S.C. § 78*o*(b)(5), or enjoin violations pursuant to Section 21(e), 15 U.S.C. § 78u(e).

9. Nothing contained herein is intended to reflect upon any non-federal defenses or causes of action such as negligence or breach of contract which plaintiff may be entitled to assert in response to defendants' claims.