**Raymond L. PALMER and Cora R. Palmer**

v.

**THOMSON & McKINNON AUCHINCLOSS, INC.**

**Civ. No. H–74–42.**

United States District Court,
D. Connecticut.

March 1, 1977.

---

firm with violating the federal securities laws and regulations thereto by leading the plaintiffs into sophisticated margin transactions in speculative securities, inappropriate to their financial needs and circumstances. Plaintiffs and defendant have executed a stipulation of fact and cross-moved for summary judgment as to the issue of liability on Count Three of the complaint. In that count, plaintiffs contend that defendant violated Section 7 of the Securities Exchange Act, 15 U.S.C. § 78g and Regulation T of the Federal Reserve Board, 12 C.F.R. § 220 *et seq.,* by extending credit in excess of the initial margin requirements set by the Reserve Board. The gravamen of this allegation is that defendant made purchases for the plaintiffs' margin account which were secured by illusory credits in their Special Miscellaneous Account (SMA) rather than the deposit of cash or securities as ostensibly required by Regulation T. These credits are claimed to be illusory because they were derived from unrealized appreciations in securities which had dropped in value by the time of the purchases in question.

The parties have at the request of the court also submitted briefs on the continued viability of this cause of action in light of the passage of Section 7(f) to the Exchange Act, 15 U.S.C. § 78g(f) (1970), making it unlawful for an investor to obtain credit in excess of the margin limits.[1]

W. Wilson Keithline, Alcorn, Bakewell & Smith, Hartford, Conn., for plaintiffs.

Americo R. Cinquegrana, Day, Berry & Howard, Ernest A. Inglis, Jr., Philip S. Walker, Hartford, Conn., for defendant.

### RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

BLUMENFELD, District Judge.

In this action for recission and damages, plaintiffs charge the defendant brokerage

*Factual Background*

To understand fully the issues involved in these motions, it is necessary to trace in some detail plaintiffs' transactions with defendant, especially the use of their SMA to meet the initial margin requirements of Regulation T. Plaintiffs Raymond and Cora Palmer are a retired couple in their seventies. On March 21, 1972, they transferred their margin account with Shearson Hamill & Co., Inc. to the defendant. This transfer resulted in a deposit with the defendant of 2,500 shares of Jack Eckerd

[1] Decision on these motions was also delayed pending the filing of an *amicus* brief by the Federal Reserve Board.

Corp. (Eckerd) and an extension of credit by defendant to plaintiffs of $30,735.[2]

On that date, defendant credited plaintiffs' SMA in the amount of $6,390. The SMA is an account designed to preserve an accrued balance of cash or credit for margin customers. Such accounts are in general use throughout the securities industry. As described by Judge Pollack in *Manevich v. duPont*, 338 F.Supp. 1124, 1127 (S.D.N.Y), *aff'd*, 465 F.2d 1398 (2d Cir. 1972) (per curiam), credits in the SMA are derived from:

"cash deposited by the customer, dividends on securities held by the broker for the customer's account, any available portion of the sales proceeds of securities sold in the margin account by the customer and any appreciation in market value of the securities held in the account over the price at which they were purchased."

It is this fourth component which is at issue in this case. The credit of $6,390 represented the difference between the excess loan value of the securities and plaintiffs' adjusted debt balance. With a margin requirement of 55 per cent, the excess loan value of securities worth $82,500 was $37,125 (45% of $82,500).[3]

On March 28, 1972, the value of the Eckerd stock rose to $85,000. Forty-five per cent of the $2,500 increase was credited to the Palmers' SMA ($1,125). April 5, 1972, the shares' value rose an additional $2,500 to $87,500. Again $1,125 was added to the SMA. The next day, April 6, 1972, the value of plaintiffs' securities jumped $5,000 to $92,500. Forty-five per cent of this increase, or $2,250, was added to the SMA which now totaled $10,871.75.[4] By April 28, 1972, the value of plaintiffs' Eckerd stock had declined $10,000 and returned to its

initial worth of $82,500. No entry was made to the SMA to reflect this loss in value. In addition, a dividend of $87.41 was credited to the SMA and subtracted from the adjusted debit balance. Thus as of May 9, 1972, plaintiffs had an SMA of $10,959.26 and a debit balance of $30,839.79.

On May 9, 1972, defendant purchased 500 more shares of Eckerd stock for the plaintiffs at a cost of $16,952.75. To meet the 55 per cent margin requirement of Regulation T, defendant debited plaintiffs' SMA $9,324.01 (55% of $16,952.75). After the purchase, plaintiffs had a debit balance of $47,792.54 ($30,839.79 + $16,952.75) and an SMA of $1,635.25 ($10,959.26 − $9,324.01). It is clear that if the SMA had been adjusted to reflect the decline in value of plaintiffs' prior holdings in Eckerd, they would not have had sufficient equity in their accounts to purchase the new shares at the 55 per cent margin requirement.

Between May 9, and November 14, 1972, the only entries to plaintiffs' margin accounts consisted of interest charges of $1,782.21 and a dividend credit of $225. At plaintiffs' request, on November 15, 1972, the defendant sent plaintiffs a check for $200. This transaction was effected by reducing the SMA $200 and adding $200 to their debit balance. The defendant did not execute a Federal Reserve Form T–4 which is normally required in cases of non-securities related customer borrowings. 12 C.F.R. § 220.7.

Finally on November 28, 1972, defendant purchased 4,500 shares of Ward Cut-Rate Drug Co. (Ward) for plaintiffs margin account at a cost of $111,936.60. On the same day, defendant created a "short" account for the plaintiffs and sold the 3,000 shares of Eckerd for $113,921.65.[5] In con-

---

**2.** The Eckerd stock then had a value of $33 per share and a total value of $82,500. The margin requirement of the Federal Reserve Board promulgated pursuant to § 220.8 of Regulation T was 55 per cent. On March 21, 1972, the credit extended by the defendant to the plaintiffs was within the limits set by Regulation T.

**3.** $37,125 − $30,735 = $6,390.

**4.** As a result of a bookkeeping error immaterial to this action, plaintiffs' SMA was mistakenly debited $18.25.

**5.** These shares were sold "short against the box." The parties agree in their stipulation that under this procedure, "the plaintiffs' margin account continued to hold 3,000 shares of Eckerd and the defendant arranged for the plaintiffs' short account to borrow 3,000 shares of Eckerd from a third party and to sell the

formity with its interpretation of Regulation T's "same day transaction" rules, defendant did not require the deposit of any additional equity to plaintiffs' account since the shares sold had a greater market value than those purchased. As the value of their Ward shares declined, plaintiffs fell below the house maintenance margin requirements of defendant.[6] The short account was closed out March 9, 1973; the Ward shares were sold on April 24, 1973.

Plaintiffs contend that the May 9th purchase of Eckerd stock, the November 15th "withdrawal" of $200, and the November 28th purchase of Ward securities were all violations of Regulation T for which they claim damages.

### The Existence of a Private Cause of Action[7]

As a preliminary question, the court must explore whether plaintiffs can maintain a cause of action against Thomas & McKinnon Auchincloss for the alleged violations of Section 7 of the Exchange Act[8] and Regulation T. Section 220.3(b)(1) of Regulation T provides in pertinent part:

"A creditor shall not effect for or with any customer in a general account . . any transaction which . . . creates an excess of the adjusted debit balance of such account over the maximum loan val-

borrowed stock in the short account." Stipulation of Fact, n. 32.

**6.** The Regulation T limits apply only to the initial purchase. Rule 431(b) of the Rules of the New York Stock Exchange provides that member brokers require a 25 per cent "maintenance margin" of all customers. The house "maintenance margin requirement" of the defendant for shares held "long" in margin accounts was 30 per cent. For stock held short against the box the house standard was only 10 per cent.

**7.** The question is not one of "standing" as plaintiffs' brief suggests, but rather whether the Palmers can "state a cause of action of 'claim for relief'" against the defendant. *Lank v. New York Stock Exchange,* 548 F.2d 61, 64 (2d Cir. 1977).

**8.** Section 7(c) of the Securities Exchange Act dictates:

ue of the securities in such account . . unless in connection therewith the creditor obtains, as promptly as possible and in any event before the expiration of 5 full business days following the date of such transaction, the deposit into such account of *cash or securities* in such amount that the cash deposited plus the loan value of the securities deposited equals or exceeds the excess so created . . .." (Emphasis supplied).

Plaintiffs argue that the uncorrected appreciations in the SMA were not the equivalent of cash or securities and so could not be used to satisfy the margin requirements. In *Pearlstein v. Scudder & German,* 429 F.2d 1136 (2d Cir. 1970), *cert. denied,* 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971), the Court of Appeals held that an investor has a federal implied right of action for violations of Regulation T. Subsequent to that decision, Congress enacted Section 7(f) of the Exchange Act which renders an investor equally responsible with his broker for observance of the margin requirements by making it unlawful for a borrower to secure credit in violation of the Reserve Board limits. 15 U.S.C. § 78g(f). The court is therefore faced with the unenviable task of determining to what extent, if any, the holding in *Pearlstein* has been undercut by the amendment to the Act.[9]

Section 7(f) states that:

"It shall be unlawful for any member of a national securities exchange or any broker or dealer, directly or indirectly to extend or maintain credit . . . to or for any customer—(1) on any security . . . in contravention of the rules and regulations which the Board of Governors of the Federal Reserve Board shall prescribe."

**9.** In *Pearlstein v. Scudder & German,* 527 F.2d 1141 (2d Cir. 1975), the Court of Appeals established a rule of damages for private actions under Section 7. The court, however, commented on the changes in the statute and said, "The effect of these developments is to cast doubt on the continued viability of the rationale of our prior holding." 527 F.2d at 1145 n. 3. The Court of Appeals did not reach the issue in *Freeman v. Marine Midland Bank–New York,* 494 F.2d 1334, 1337–38 n. 4 (2d Cir. 1974), because the transactions there antedated the amendments to the Act. Judge Tyler in *Bell v. J. D. Winer & Co.,* 392 F.Supp. 646 (S.D.N.Y. 1975), distinguished *Pearlstein* and suggested

"It shall be unlawful for any United States person . . . to obtain, receive, or enjoy the beneficial use of a loan or other extension of credit from any lender . . . for the purpose of (A) purchasing or carrying United States securities . . . if, under this section or rules and regulations prescribed thereunder, the loan or other credit transaction is prohibited."

The Act's implementation is entrusted to the Federal Reserve Board which may in its discretion exempt any class of persons from the statute's application. The Reserve Board has promulgated Regulation X to enforce the Act's prohibitions. 12 C.F.R. § 224 *et seq.*

First there is nothing in the legislative history to suggest that Congress intended to overrule the *Pearlstein* decision by amending Section 7 of the Exchange Act. Rather Congress' stated purpose was to prevent "[t]he infusion of unregulated foreign credit into American securities markets."[10] According to the House Report, investors were using secret foreign banks and credit sources to finance purchases in American securities markets. There was doubt as to whether Section 7(c) reached such foreign lenders. *See Metro-Goldwyn-Mayer, Inc. v. Transamerica Corp.,* 303 F.Supp. 1354 (S.D. N.Y.1969). To maintain the fiscal integrity of national securities and credit markets, Congress felt it most feasible to place on the investor a duty to comply with the initial margin requirements if his sources of credit were outside the United States. The House Report notes:

"Part of the reason why Section 7 was originally enacted in its present form may have been a concern over putting the small investor at risk as to whether his broker or lender was complying with

the regulations. The amendment has been carefully drawn to avoid this result."[11]

Although the statutory language is a good deal less than clear on this point, it seems plain that Congress did not intend to deprive all investors of a private cause of action for breach of the initial margin requirements.

At the same time, Judge Waterman in the original *Pearlstein* decision relied heavily on the fact that the statute then forbade the broker from extending excessive credit but did not make it unlawful for the customer to accept such credit. Judge Waterman stated:

"This fact appears to indicate that Congress has placed the responsibility for observing margins on the broker, for the original need for requirements undoubtedly derived from the common desire of investors to speculate unwisely on credit. Moreover, whereas brokers are charged by law with knowledge of the margin requirements, the extent of an investor's knowledge of these rules would frequently be difficult of tangible proof."

429 F.2d at 1141. *Pearlstein,* however, involved an experienced investor who had contributed by his own actions to much of the loss incurred. Judge Waterman's discussion of the prior statute's failure to include investors within its prohibitions was directed to his conclusion that a defense of *in pari delicto* was not available to the brokerage firm. While the changes in the Act may have expanded the possible defenses of a creditor in a Section 7 action, I am not persuaded that the Court of Appeal's holding that borrowers possess an implied right of action for violations of the margin requirements should be changed. *Lewis v. Rockefeller,* 431 F.2d 368, 371 (2d Cir. 1970).

that the court's earlier holding had been limited by the legislative changes. *See also Neill v. David A. Noyes & Co.,* 416 F.Supp. 78 (N.D.Ill. 1976); *Freeman v. Marine Midland Bank–New York,* 419 F.Supp. 440 (E.D.N.Y.1976); *Evans v. Krebs & Co.,* 411 F.Supp. 616 (S.D.N.Y. 1976); *Newman v. Pershing & Co., Inc.,* 412 F.Supp. 463 (S.D.N.Y.1975); Comment, *Civil Liability for Margin Violations—The Effect of*

*Section 7(f) and Regulation X,* 43 Fordham L.Rev. 93 (1974).

10. ·Report of the House Committee on Banking and Currency, H.R.Rep.No.91–975, U.S.Code Cong. & Admin.News 1970, 91st Cong.2d Sess. at p. 4409.

11. *Id.*

*But see Utah State University of Agriculture and Applied Science v. Bear, Stearns & Co.,* 549 F.2d 164 (10th Cir. 1977).[12]

■ The Supreme Court has set out a series of factors to consider in determining whether a private remedy is implicit in a statute that does not expressly provide one. The court must determine if the plaintiff is within the class the statute was intended to protect, if there is any legislative intent either to create or deny such a remedy, if a private remedy would be consistent with the underlying legislative scheme, and finally if the cause of action is one traditionally relegated to state law so that the creation of a federal remedy might be inappropriate. *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). The Securities Exchange Act of 1934 was passed to protect the general investing public against fraud and manipulation of stock prices and so encourage public participation in the capital markets. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Section 7 of the Exchange Act was, however, directed primarily to the macroeconomic purpose of general credit regulation. The protection of the small investor who might have spread himself too thin by overspeculation was seen as "a byproduct of the main purpose."[13] Since *Remar v. Clayton Securities Corp.,* 81 F.Supp. 1014 (D.Mass.1949), though, courts have recognized that private actions by investors are an effective means of protecting the national economy from margin infringements. *See Pearlstein v. Scudder & German, supra,* 429 F.2d at 1140 n. 7; *Stonehill v. Security National Bank,* 68 F.R.D. 24 (S.D.N.Y.1975). Margin violations are in the nature of "victimless crimes" which neither broker nor borrower is likely to report. The likelihood of administrative enforcement is therefore remote.[14] The Second Circuit in *Pearlstein* found that private investors were within the class intended to benefit from the statute and so implied a private enforcement action. The legislative history of Section 7(f) and the regulations promulgated by the Federal Reserve Board indicate that at least with respect to the good faith borrower, private actions are still consistent with the intent and purpose of the Act.

The 1970 amendments to the Exchange Act were part of an effort at national credit regulation. There seems no intent to make small, unsophisticated investors responsible for complying with the margin requirements. Regulation X implies that only borrowers who "falsely," "wilfully," or "intentionally" evade the provisions of the Act are subject to its sanctions. 12 C.F.R. § 224.1. Section 224.6(a) of Regulation X makes clear:

> "An innocent mistake made in good faith by a borrower in connection with the obtaining of credit shall not be deemed to be a violation of this part . . . if promptly after discovery of the mistake the borrower takes whatever action is practicable to remedy the noncompliance."

An innocent, good faith borrower may not even be in violation of the new amendments then. There seems no reason, therefore, to deprive him of his cause of action when such suits continue to serve the broad public purpose of national credit regulation and aid in enforcement of the statutory prohibitions.

■ Thus the plaintiffs may maintain a cause of action against their broker for a violation of Section 7 of the Exchange Act and Regulation T. The effect of Section 7(f), though, is to restore to the broker certain defenses based upon comparative

---

12. The Court of Appeals for the Tenth Circuit has recently reviewed the amendments to Section 7 and the cases cited in note 9, *supra,* and refused to follow the Second Circuit's ruling in *Pearlstein.* While I regret my inability to join in Judge Breitenstein's thorough opinion, every court "must follow . . . [its] own star." *Danielson v. Joint Bd. of Coat, Suit & Allied Gar. Wkrs. U.,* 494 F.2d 1230, 1245 (2d Cir. 1974).

13. Report of the House Committee on Interstate & Foreign Commerce, H.R.Rep.No.1383, 73d Cong. 2d Sess. 8 (1934). *See Bell v. J. D. Winer & Co., supra,* 392 F.Supp. 646, 652–53 n. 5.

14. Note, *Regulation X—A Complexis,* 50 Notre Dame Lawyer 136, 141 (1974).

fault, such as *in pari delicto*.[15] To prosecute an action successfully, a plaintiff must demonstrate his good faith—that he acted innocently without knowledge that the transaction violated the margin requirements.[16] In this case, defendant has in fact put plaintiffs' prior experience as investors and knowledge of the margin limits in issue—both in the pleadings and in depositions.[17] Defendant portrays Mr. Palmer as an experienced trader who made his own investment decisions and was familiar with the margin rules. The plaintiffs' good faith and knowledge of the margin regulations are questions of fact for trial which preclude summary judgment for either party on this issue.

## The Margin Violations

■ Defendant strenuously argues that its use of the SMA credits to satisfy the margin requirements was consistent with Regulation T.[18] If there was no violation of the regulation, defendant would, of course, be entitled to summary judgment on Count Three. Regulation T requires the creditor to obtain "cash or securities" from the customer when a purchase causes the customer's adjusted debit balance to exceed the maximum loan value of the securities in the account. The question presented is whether a past, unrealized appreciation on securities which have subsequently declined in value is the equivalent of cash or securities for the purposes of § 220.3(b)(1) of Regulation T. I hold it is not.

The SMA accounting procedure is evidently a wide-spread practice throughout the investment industry. Each time plaintiffs' Eckerd shares rose in value, 45 per cent of that appreciation was credited to the SMA. But market prices go down as well as up. Indeed, the market price of the Eckerd shares did decline prior to the initial May 9th purchase. However, the SMA continued to reflect the credits arising out of the past appreciation. The defendant, supported by the Federal Reserve Board, contends that the SMA merely represents sums which the customer could have withdrawn and so obtained cash, but did not. Since Regulation T deals only with the initial margin requirements and not maintenance requirements, defendant and the Federal Reserve Board maintain this procedure for preserving purchasing power complies with the regulation.

This argument confuses the time at which Regulation T comes into play. One must look to the time of the purchase of the Eckerd stock, May 9, 1972, and the Ward shares, November 28, 1972, to determine if there has been a violation of the regulation. Did the plaintiffs have sufficient cash, securities, or their equivalent to meet the margin requirements on those dates? The fact that at some prior time they might have had enough additional loan value in their securities to purchase the stock is irrelevant. The plaintiffs did not enter into a borrowing on March 28th, April 5th or April 6th when the credits arising out of the stock appreciations were entered on their accounts. They incurred no interest costs. The argument that they can be "deemed" to have borrowed the additional loan value is a fiction unsupported by the facts and in conflict with the Reserve Board's direction that the SMA "shall not be used in any way for the purpose of evading or circumventing any of the provisions of this part." 12 C.F.R. § 220.4(a)(3).

---

**15.** This is the view taken in *Lantz v. Wedbush, Noble, Cooke, Inc.,* 418 F.Supp. 653 (D.Alaska 1976), and is consistent with Judge Tyler's reasoning in *Bell v. J. D. Winer & Co., supra.* The enactment of Section 7(f) does not proscribe private acts by borrowers, but only creates a defense of *in pari delicto* to the action.

**16.** Such a rule would avoid the "heads-I-win tails-you-lose" result that Judge Friendly criticized in his *Pearlstein* dissent. 429 F.2d at 1148. Even Judge Friendly conceded that private actions might be appropriate in certain instances.

**17.** Deposition of Clement Amorose at 39, 77–78 (May 7, 1974).

**18.** The Reserve Board indicates, however, that if the court upholds the plaintiffs' position, the net economic impact of such a decision would be nominal except for a one-time data processing change within the brokerage firms. Amicus Brief at 18–21.

When the market price of a stock increases, the investor has new equity which can be used to satisfy the margin requirements when purchasing securities. If after the purchase, the appreciated stock used as collateral declines in value, there would be no violation of Regulation T since that section regulates only the margin requirement at the moment of purchase. On the other hand, if the stock used to make margin declines to its original value prior to the purchase of new securities, the shareholder's additional investment equity has vanished. In terms of his net worth the investor is in the same position he would have been had the stock's price remained unchanged. I am at a loss to see how a broker can extend credit on the basis of a no longer existent appreciation. A right to borrow in the past is not the equivalent of a right to borrow in the present.

I do not question the fact that the SMA procedure can be used to satisfy the margin requirements when such credits are based on cash deposits, dividends, or proceeds from the sale of securities. *McCormick v. Esposito,* 500 F.2d 620, 623–27 (5th Cir. 1974), *cert. denied,* 420 U.S. 912, 95 S.Ct. 834, 42 L.Ed.2d 842 (1975); *Manevich v. Dupont, supra.*[19] When the credit is derived from an evanescent appreciation in stock value, however, the procedure allows an investment on insufficient margin and illegally attempts to circumvent Regulation T.[20]

Because the May 9th purchase of Eckerd stock could not have been accomplished without the transfer of SMA credits based on the no longer existent appreciation, the transaction cannot conform to Regulation T. The November 28th purchase of Ward shares is similarly tainted and cannot be immunized through the same day substitution rule of § 220.3(g). Defendant does not seriously contend otherwise. The same day transaction rule is premised on the idea that initial margin requirements were satisfied at the time of the first purchase. The broker cannot be allowed to avoid liability by churning the account or substituting new stock. For the purposes of the plaintiffs' loss, the illegal extension of credit must be traced to include those shares substituted.[21]

As to the $200 transaction on November 15, 1972, I conclude that this was not a borrowing requiring the execution of a Federal Reserve Form T–4. Prior to November 15th, dividends of at least $225 were credited to the plaintiffs' account. Since the $200 sent to plaintiffs could be attributed to these dividends, the delivery of this money did not involve an extension of credit based on the illusory appreciation, but only the withdrawal of cash sanctioned by § 220.4(f)(6) of Regulation T.[22]

**19.** The question present for decision in this case was specifically left open by Judge Pollack in *Manevich v. Dupont,* 338 F.Supp. at 1127 n. 3.

**20.** The violation here does not come within the "mechanical mistake" exemption of § 220.6(k) of Regulation T. *Landry v. Hemphill, Noyes & Co.,* 473 F.2d 365, 371 (1st Cir.), *cert. denied,* 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973).

**21.** Where the parties are allowed to take advantage of the same day rule and so avoid the fact that the margin limit had been raised to 65 per cent on November 24, 1972, the newly purchased shares should be merely substituted for the old. The initial Regulation T violation remains a proximate cause of plaintiffs' actual loss.

Even if one dissects the transactions and separates out those purchases consistent with Regulation T, this causal link is unchanged. In addition, an independent violation of Regulation T on November 28, 1972 becomes conceivable. By my calculations, defendant should only have purchased $11,427.65 worth of Eckerd stock for plaintiffs on May 9th ($6,285.21/.55). The combined appreciated value of such shares with plaintiffs' original $82,500 in stock on November 28th would be $107,592.72. These shares could not have been successfully substituted for the entire $113,921.65 in Ward stock purchased. The profit from the other Eckerd shares illegally purchased would not alter the result.

**22.** Plaintiffs do not claim, and I express no opinion as to whether this withdrawal may have violated § 220.3(b)(2) of Regulation T.

*Conclusion*

To summarize, I find that defendant violated Regulation T and Section 7 of the Securities Exchange Act with respect to the stock purchases and that plaintiffs may maintain a cause of action for these violations.[23] Defendant may have a defense to the violations concerning the plaintiffs' good faith and knowledge of the margin rules. This defense presents triable issues of fact which preclude summary judgment. As to the $200 payment, no Federal Reserve Form T–4 was required and therefore the defendant is entitled to partial summary judgment on that claim alone.

SO ORDERED.

---

**23.** I express no view concerning the appropriate measure of damages for such violations, but commend to the parties' attention the allocation theory in *Pearlstein v. Scudder & German,* 527 F.2d 1141 (2d Cir. 1975).