Maurice H. SCHY and The Susquehanna Corporation, Plaintiffs,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Franklin National Bank, and National Bank of North America, Defendants.

No. 72–C–718.

United States District Court,
E. D. New York.

Oct. 27, 1977.

As Amended Oct. 31 and Nov. 4, 1977.

Pomerantz, Levy, Haudek & Block, New York City, Dilworth, Paxson, Kalish, Levy & Kauffman, Philadelphia, Pa., for plaintiffs; Abraham L. Pomerantz, and Richard M. Meyer, New York City, Bruce W. Kauffman, David H. Pittinsky, and Lawrence D. Berger, Philadelphia, Pa., of counsel.

Cahill, Gordon & Reindel, Cole & Dietz, New York City, for defendant National Bank of North America; David R. Hyde, New York City, of counsel.

Kay, Scholer, Fierman, Hays & Handler, New York City, for defendant Federal Deposit Insurance Corp.

Memorandum of Decision and Order

MISHLER, Chief Judge.

Defendants, by a motion attacking the sufficiency of the claim pursuant to Rule 12(b)(6) F.R.Civ.P., challenge plaintiffs' right to prosecute this action. The Susquehanna Corporation complains that various loans made by the defendant banks to finance its tender offer for a control block of PASCO (Pan American Sulphur Co.) stock were indirectly secured in violation of section 7 of the Securities Exchange Act of 1934, 15 U.S.C. § 78g,[1] and the margin

---

1. Section 7 of the Securities Exchange Act of 1934, 15 U.S.C. § 78g provides in pertinent part that:

    (a) For the purpose of preventing the excessive use of credit for the purchase or carrying of securities, the Board of Governors of the Federal Reserve System shall, prior to October 1, 1934, and from time to time thereafter, prescribe rules and regulations with respect to the amount of credit

requirements of regulation U promulgated thereunder. 12 C.F.R. § 221.1 *et seq.* Plaintiff seeks to recover the losses it suffered due to the decline in the stock's market value as well as the interest and fees paid in connection with the loans. In seeking dismissal, defendants argue that no private remedy for violations of the margin requirements may be implied in favor of plaintiffs.

Taken together, section 7 and regulation U recite a pervasive legislative scheme governing the terms under which banks may extend credit for the purchase of market securities. Section 221.1(a) of regulation U provides in part that:

> . . . no bank shall extend any credit secured directly or indirectly by any stock for the purpose of purchasing or carrying any margin stock in an amount exceeding the maximum loan value of the collateral, as prescribed from time to time . . . . [2]

It is not disputed that the loans exceeded in amount the permissible limits as prescribed by the prevailing margin requirements.

Defendants deny, however, that the loans were either directly or indirectly secured, a necessary element of any regulation U violation. *Freeman v. Marine Midland Bank-New York*, 494 F.2d 1334, 1338 (2d Cir. 1974). The several loan agreements make no express reference to direct security. Plaintiffs' theory of action, rather, rests on a claim of indirect security which finds its basis in certain oral agreements and pre-existing written contracts that were incorporated by reference, which allegedly encumbered Susquehanna's ability to sell, pledge or otherwise dispose of the PASCO stock.[3] In order to more fully appreciate the context of plaintiffs' claim, a brief recitation of the facts as outlined in the complaint is in order.

## FACTS ALLEGED IN THE COMPLAINT

After acquiring a control block of Susquehanna stock and orchestrating a merger with his firm (the American Gypsum Company) Herbert Korholtz succeeded to the reigns of the new Susquehanna empire. Not long thereafter, Korholtz sought con-

---

that may be initially extended and subsequently maintained on any security (other than an exempted security).

. . . . .

(d) It shall be unlawful for any person not subject to subsection (c) of this section to extend or maintain credit for the purpose of purchasing or carrying any security, in contravention of such rules and regulations as the Board of Governors of the Federal Reserve System shall prescribe to prevent the excessive use of credit for the purchasing or carrying of or trading in securities in circumvention of the other provisions of this section . . . .

2. Subsection (b) of 12 C.F.R. § 221.3 provides that:

The "purpose of a credit" is determined by substance rather than form.

(1) Credit which is for the purpose, whether immediate, incidental, or ultimate, of purchasing or carrying a margin stock is "purpose credit", despite any temporary application of funds otherwise.

(2) Credit to enable the customer to reduce or retire indebtedness which was originally incurred to purchase a margin stock is for the purpose of "carrying" such a security.

3. Indirect security is defined in 12 C.F.R. § 221.3(c) to include:

any arrangement with the customer under which the customer's right or ability to sell,

pledge, or otherwise dispose of stock owned by the customer is in any way restricted so long as the credit remains outstanding, or under which the exercise of such right, whether by written agreement or otherwise, is or may be caused for acceleration of the maturity of the credit: *Provided,* That the foregoing shall not apply (1) if such restriction arises solely by virtue of an arrangement with the customer which pertains generally to the customer's assets unless a substantial part of such assets consists of stock or (2) if the bank in good faith has not relied upon such stock as collateral in the extension or maintenance of the particular credit . . . .

. . . . .

Elaborating on the proviso, the Federal Reserve Board has noted in § 221.117 that:

whether or not a bank has relied upon particular stock as collateral is necessarily a question of fact to be determined in each case in the light of all relevant circumstances. . . . [S]ome indication that the bank had not relied upon stock as collateral would seem to be afforded by such circumstances as the fact that (1) the bank had obtained a reasonably current financial statement of the borrower and this statement could reasonably support the loan, and (2) the loan was not payable on demand . . . .

trol of the Pan American Sulphur Co., a natural resources outfit based in Houston, Texas. In order to finance a contemplated tender offer, Susquehanna arranged an 18 month, $72 million credit line, and executed, on October 1, 1968, a credit agreement with the First National Bank of Boston ("FNBB"), the Franklin National Bank, and the Security Pacific National Bank ("SPNB"). Embodied in paragraph 3 of the credit agreement was a "cross default" provision [4] which incorporated the negative covenants of pre-existing agreements covering loans assumed by Susquehanna, as well as various restrictions on consolidated working capital that were part of an indenture agreement relating to Susquehanna's issuance of $22.5 million of convertible subordinated debentures. Accordingly, if Susquehanna's consolidated working capital dipped below $4.5 million, or its net worth below $5.5 million, or if it in any way mortgaged or pledged its assets without the consent of creditors, Susquehanna would be in default of the surviving credit agreement. With commitments from both FNBB and SPNB for $20 million and Franklin for $10 million, Susquehanna turned to the National Bank of North America and executed a letter agreement embodying the same terms for an additional $6 million. A six month commitment for the remaining $15 million in financing was later procured from Guinness Mahon & Co., a foreign syndicate.

Susquehanna went ahead with its tender offer and was successful in acquiring a control block of shares. In January, 1969, having been informed of Susquehanna's success, the banks wired their approval of the financing.[5] Acceding to the bank's demands, Susquehanna signed fourteen month rather than eighteen month notes.[6] However, it soon became obvious that Susquehanna could not meet its obligations. Within two months of the extension of credit, the debt was a current liability thus throwing Susquehanna in default of the minimum working capital provision of the debenture indenture, and by virtue of the "cross default" provision, of the loan agreements. Unable to pledge or encumber any of its assets and facing the possibility of acceleration, Susquehanna sought an extension under the original agreement.

Susquehanna was further beleaguered by the expiration of the six month, $15 million extension of credit by the Guinness group. In order to retire part of that debt, Susque-

---

4. The "cross default" provision embodied in § 3.01 of the loan agreements provided that:

> The occurrence of any one or more of the following events shall constitute an *Event of Default*:
>
> \* \* \* \* \* \*
>
> (d) An event of default as defined in any mortgage, indenture or instrument, under which there may be issued, or by which there may be secured or evidenced, any indebtedness of the Company, whether such indebtedness now exists or is hereafter created . . .

Thus, Susquehanna would have been in default if, in violation of § 8.10 of the loan agreement, it:

> . . . create[d] or incur[red] or suffer[ed] to be created or incurred or to exist any encumbrance or any mortgage, pledge, lien, charge or other security interest of any kind upon any of its property or assets of any character, whether [before] owned or [thereafter] acquired . . .

or, if in contravention of § 8.15, it

> [sold], lease[d] or otherwise dispose[d] of any plant or a substantial part of its assets . . . .

Similarly, if under 8.07 of the pre-existing agreement Susquehanna failed to maintain a consolidated working capital of $5.5 million during the term of the debenture, it too would have been in violation of the "cross default" provision.

5. The Security Pacific National Bank, after hearing the details of the proposed offering, refused to commit its $20 million. In its stead, a commitment was procured from the S.M.C. Investment Corp., which agreed to extend $20 million in financing under the same terms as the others.

6. Aware that the contemplated loans were to be used to finance the tender offer, the lending banks approved the credit extension after receiving word of Susquehanna's success. The Banks, extending a combined $56 million loan, demanded fourteen month notes. The Guinness group, however, would only agree to a six month extension of credit, and to that only after receiving oral assurances that the American banks would arrange a syndicate loan to enable Susquehanna to effect repayment.

hanna was forced to borrow $4 million from SPNB pursuant to the terms and conditions of the original credit agreement. As additional security for the SPNB loan, Franklin issued an irrevocable letter of credit conditioned on Susquehanna's agreement to first apply any proceeds from the sale of its securities to the reduction or retirement of that loan.

Rather than agreeing to an extension, the banks, on March 6, 1970, induced Susquehanna to sign a combined $40 million refunding loan agreement. A similar "cross default" provision was included which imposed even stricter consolidated working capital requirements, and a provision was added granting the banks a lien on the corporate assets. Thereafter, in September, 1970, Susquehanna pledged the PASCO common stock previously purchased as direct collateral for the credit extended. Pressures, however, continued to mount. After signing yet another refinancing agreement, Susquehanna was ultimately forced to sell its PASCO holdings to Studebaker-Worthington, Inc. The loans were eventually repaid, but Susquehanna sustained a total loss of more than $70 million.

In May, 1972, Maurice Schy, a Susquehanna shareholder, commenced this derivative action[7] alleging that the defendant banks, in extending secured loans for the full purchase price of the PASCO tender offer, violated section 7 of the Securities Exchange Act and regulation U promulgated thereunder. Susquehanna, the real party in interest, was later realigned as a party plaintiff.[8] It is plaintiffs' contention that the "cross default" provision of the loan agreement (and refunding agreements as well) operated to create an indirect security interest in the banks' favor. Plaintiffs maintain that the loan in effect was a "demand" loan since the banks knew that Susquehanna could not effect repayment within the stated fourteen month maturity. Therefore, plaintiffs argue, it may be properly inferred that the banks were primarily relying on the collateralized stock for repayment, an arrangement that constitutes indirect security under the terms of regulation U. See 12 C.F.R. §§ 221.3(c) and 221.-117(b); Freeman v. Marine Midland Bank-New York, supra at 1339[9] & n.5. As we must, we assume for the purposes of this motion that the extension of credit violated the margin requirements.

### THE MOTION

The defendants in this facet of the multidistrict litigation move to dismiss[10] challenging plaintiffs' standing to maintain the action. Section 7 of the Securities Exchange Act does not expressly provide litigants a damage remedy. The question posed by the instant motion is whether a right of action may be implied in favor of the borrower, here Susquehanna, where the

7. The Judicial Panel on Multidistrict Litigation, on March 11, 1975, consolidated the pretrial discovery of this action and two other related matters then pending in the Southern District of New York and the Central District of California. Judge Frankel was assigned the task of coordinating the discovery process. A fourth related action pending in the District of Massachusetts before Chief Judge Coffrey was also consolidated on May 1, 1975. Defendants in the District of Massachusetts raised the same claim that this court considers, but their motion for summary judgment continues to pend before the Massachusetts court.

8. Susquehanna was originally named a nominal defendant, but pursuant to Judge Judd's memorandum and order of February 19, 1975, was realigned as a party plaintiff and granted leave to file a second amended complaint. Schy nevertheless, remained in the action. The action as initially filed named the Franklin National Bank as a defendant. Pursuant to the court's March 3, 1975 memorandum and order, the FDIC as receiver of the bank was substituted.

9. See, supra note 3.

10. This court, in a recent pretrial conference on the matter, invited the defendants to file a motion to dismiss in order to determine plaintiffs' standing to maintain this suit. Defendants instead filed a motion for summary judgment submitting the memoranda previously filed in the District of Massachusetts, supplemental memoranda, a detailed recitation of the facts as drawn by plaintiff, and rule 9(g) statements. As indicated, we will nevertheless treat this motion as one attacking the sufficiency of the complaint pursuant to rule 12(b)(6) F.R. Civ.P.

lending banks in extending credit violated the terms of the margin regulations.

Defendants contend that unlike the Act's anti-fraud provisions (e. g. §§ 9, 10 and 14), which are directed primarily at the protection of investors, the margin regulations were enacted to serve a purely macroeconomic purpose. Congressional concern was with the overflow of credit into the securities market and its deflationary impact. Defendants claim that the legislation was designed to impose credit limitations; investor protection being a mere by-product. With regulatory powers in the Federal Reserve Board and enforcement powers in the Securities Exchange Commission and the Department of Justice, defendants argue that judicial implication of a private right of action would do nothing to further the statutory purpose.

Plaintiffs, on the other hand, urge that a private right of action is a necessary supplement to government enforcement and would serve to further the remedial objectives of the legislative scheme. Plaintiffs concede the regulation's macroeconomic purpose, but argue that the $71 million at issue had a substantial impact on stock market speculation. Citing section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, the general jurisdictional provision,[11] plaintiffs argue that the regulatory nature of the margin requirements contemplates private enforcement as a means of insuring investor protection. The private remedy, plaintiffs claim, is not only consistent with this legislative purpose, but it serves as a deterrent against the unscrupulous lender.

## DISCUSSION

In *Pearlstein v. Scudder & German*, 429 F.2d 1136 (2d Cir. 1970) (*Pearlstein I*), the court was confronted with the very question presented here. Pearlstein, a sophisticated individual speculator, made two separate bond purchases on his margin account kept with the defendant Scudder. He failed, however, to tender the necessary payment within seven business days of the transaction. Under regulation T, governing the extension of credit by brokers and dealers, Scudder was required to sell the bonds on Pearlstein's account. It did not, but rather sued for the amount due and secured a consent judgment. The price of the bonds plummeted causing Pearlstein to sustain significant losses. Pearlstein sued to recoup his loss charging Scudder with a violation of regulation T.[12]

The court found that Pearlstein had an implied right of action against Scudder for its violation of the margin requirements, holding that while investor protection was only an incidental purpose of section 7, ". . . private actions by market investors are a highly effective means of protecting the economy as a whole from margin violations by [lenders] . . . ." *Pearlstein I, supra* at 1140. The majority observed that:

> . . . the federally imposed margin requirements forbid a broker to extend undue credit but do not forbid customers from accepting such credit. This fact appears to indicate that Congress has placed the responsibility for observing margins on the broker . . . . *Id.* at 1141.

The court reasoned that the danger of permitting a windfall gain to an unscrupulous investor is far outweighed by the deterrent effect that the threat of a damage suit may have.

11. Section 27 of the Exchange Act, 15 U.S.C. § 78aa, provides in pertinent part that:

> The district courts of the United States, and the United States court of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder . . .

12. Regulation T, governing the extension of credit by brokers and dealers, is the companion to regulation U which regulates bank financing used to purchase securities. The second circuit has treated regulation T and regulation U cases interchangeably. *See e. g. Freeman v. Marine Midland Bank-New York, supra*; *Stonehill v. Security National Bank*, 68 F.R.D. 24 (S.D.N.Y. 1975); *National Bank of North America v. Quest*, 425 F.Supp. 186 (E.D.N.Y.1977).

Plaintiffs rely heavily on *Pearlstein* and its progeny. *See, e. g., Daley v. Capitol Bank and Trust Co.,* 506 F.2d 1375 (1st Cir. 1974); *McCormick v. Esposito,* 500 F.2d 620 (5th Cir. 1974), *cert. denied,* 420 U.S. 912, 95 S.Ct. 834, 42 L.Ed.2d 842 (1975); *Landry v. Hemphill, Noyes & Co.,* 473 F.2d 365 (1st Cir.), *cert. denied,* 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973); *Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 469 F.2d 1166 (8th Cir. 1972); *Goldman v. Bank of the Commonwealth,* 467 F.2d 439 (6th Cir. 1972); *Palmer v. Thomson & McKinnon Auchincloss, Inc.,* 427 F.Supp. 915 (D.Conn.1977). Extending the *Pearlstein* court's reasoning, plaintiffs maintain that since the scheme operates to regulate the lender, it only follows that the investor was the intended beneficiary of the statute. It being clear that the provision was to serve a protective function, a private enforcement weapon plaintiff contends, is consistent with Congress' intent.

Our consideration of the question must turn on an interpretation of *Pearlstein I* in light of subsequent legislation and decisional law. The House report accompanying the original bill noted:

> The main purpose of these margin provisions . . . is not to increase the safety of security loans for lenders. Banks and brokers normally require sufficient collateral to make themselves safe without the help of the law. *Nor is the main purpose even protection of the small speculator by making it impossible for him to spread himself too thinly—although such a result will be achieved as a by-product of the main purpose.*
>
> *The main purpose is to give a Government credit agency an effective method of reducing the aggregate amount of the nation's credit resources which can be directed by speculation into the stock market* and out of other more desirable uses of commerce and industry—to prevent a recurrence of the pre-crash situa-

tion where funds which would otherwise have been available at normal interest rates for uses of local commerce, industry and agriculture, were drained by far higher rates into security loans and the New York call market.

H.R.Rep.No.1383, 73d Cong.2d Sess. 8 (1934). (emphasis added). Earlier attempts to ensure investor protection through the establishment of maximum loan values proved futile. Criticism was directed at the deflationary effect such provisions would have on an already depressed economy. The bill's sponsors pressed the economic importance of securities speculation and the role of margin trading. Proposals to vest administrative powers in the Federal Trade Commission were ultimately abandoned in favor of Federal Reserve Board oversight which was thought better to ensure the scheme's macroeconomic objectives. As finally enacted, the margin provisions provided "a supplementary instrument of credit policy—one of the means of making a broad credit and monetary policy effective." Joint Comm. on the Economic Report, 82d Cong. 2d Sess., Monetary Policy and the Management of the Public Debt 409 (Comm.Print.1952); *see gen.* Note, Federal Margin Requirements As A Basis for Civil Liability, 66 Colum.L.Rev. 1462, 1468–71 (1966).

Thus, it appears that Congress did not consider the provision to serve a prophylactic function. Simply because the statute operates to regulate brokers and institutional lenders, it does not *a fortiori* follow that investors were to receive extraordinary protection. The macroeconomic purpose and regulatory nature of the section suggest that the provision's intended beneficiaries are the members of the entire populace. For it is society in general that benefits from the diversion of credit into other areas.

Moreover, section 7 was amended in 1970 to add subsection (f), 15 U.S.C. § 78g(f),[13]

---

**13.** Section 7(f) of Title 15 U.S.C. provides in pertinent part that:

(1) It is unlawful for any United States person, or any foreign person controlled by a

United States person or acting on behalf of or in conjunction with such person, to obtain, receive, or enjoy the beneficial use of a loan or other extension of credit from any lender

making it illegal for any person to obtain, receive or enjoy an unlawful extension of credit. The amendment was implemented by regulation X, 12 C.F.R. § 224 *et seq.*, promulgated the following year by the Board of Governors of the Federal Reserve. Regulation X prohibits any person from obtaining credit when to do so would cause the creditor to violate regulations T (governing the extension of credit by brokers or dealers) or U (governing bank financing).[14] Thus, responsibility for compliance now rests with the customer as well as the lender.

There is no firm evidence that the 1970 amendment was enacted in response to *Pearlstein.* Congress was concerned with the infusion of foreign credit into the American securities market; there was doubt as to whether section 7 reached lenders. *In order to inject stability into, and maintain the fiscal integrity of the national securities and credit markets, Congress thought it sound to place the duty of compliance on the investor.* Report of the House Committee on Banking and Currency, H.R.Rep.No.91–975, 91st Cong. 2d Sess. 4, *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 4394, 4409.

The change has prompted widespread reanalysis of *Pearlstein I* principles. The court itself in *Pearlstein v. Scudder & German,* 527 F.2d 1141 (2d Cir. 1975) (*Pearlstein II*) observed:

> . . . that in our prior opinion in this case, emphasis was placed on the fact that 'the federally imposed margin requirements forbid a broker to extend undue credit but do not forbid customers

from accepting such credit.' 429 F.2d at 1141. However, the addition of section 7(f) to the Exchange Act in 1970, 15 U.S.C. § 78g(f), as well as the promulgation by the Federal Reserve Board of Regulation X, 12 C.F.R. § 224 (1975), have now made it unlawful to *obtain* credit in violation of the margin requirements. The effect of these developments is to cast doubt on the continued viability of the rationale of our prior holding. *Id.* at 1145 n. 3. (citations omitted). The tenth circuit has gone so far as to hold that the amendment operates to overturn the *Pearlstein I* doctrine thus stripping investors of their right to sue. *See Utah State University of Agriculture and Applied Science v. Bear, Stearns & Co.,* 549 F.2d 164 (10th Cir. 1977). Although Congress did not primarily intend, with the enactment of section 7(f), to impose the burden of compliance on the investor using domestic money markets, the amendment, nevertheless, has had that effect. Congress' statement at the very least must be construed to suggest that private access should be sharply restricted. *Bell v. J. D. Winer & Co., Inc.,* 392 F.Supp. 646, 654 (S.D.N.Y.1975). Certainly a private remedy should not be afforded the investor who was in a position to know of the violation. *Goldman v. Bank of Commonwealth, supra* at 446; *cf. Palmer v. Thomson & McKinnon Auchincloss, Inc.,* 427 F.Supp. 915 (D.Conn.1977); *Neill v. David A. Noyes & Co.,* 416 F.Supp. 78 (N.D.Ill. 1976); *Newman v. Pershing & Co., Inc.,* 412 F.Supp. 463 (S.D.N.Y.1975).

True, all of the transactions involved here antedated the addition of subsection (f). Thus, any denial of an implied right of

---

(without regard to whether the lender's office or place of business is in a State or the transaction occurred in whole or in part within a State) for the purpose of (A) purchasing or carrying United States securities, or (B) purchasing or carrying within the United States of any other securities, if under this section or rules and regulations prescribed thereunder, the loan or other credit transaction is prohibited or would be prohibited it it had been made or the transaction had otherwise occurred in a lender's office or other place of business in a State . . .

**14.** 12 C.F.R. § 224.2 provides in pertinent part:

(a) *Credit obtained from within the United States.*

A borrower shall not obtain any purpose credit from within the United States unless he does so in compliance with the following conditions:

. . . . .

(3) Credit obtained from a bank shall conform to the provisions of Part 221 of this chapter (Regulation U), except for § 221.2(i). Except for such section, Part 221 of this chapter (Regulation U) is hereby incorporated in this part (Regulation X) . . .

action cannot turn on Congress' latest pronouncement. *Freeman v. Marine Midland Bank-New York, supra* at 1337 n. 4.[15] However, a fair reading of the amendment is a reaffirmance by the Congress of its refusal to extend protection to investors through a grant of a right of action against lenders violating the margin requirements.

This appears to be particularly true when we reexamine *Pearlstein I* and *Freeman* in light of a recent line of Supreme Court cases which evince a trend towards restrictive federal court access. *E. g. Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) (derivative stockholders action based on a criminal statute prohibiting corporate contributions in federal elections); *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (minority shareholder may not pursue private remedy under § 10(b) once there has been full and fair disclosure); *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) (defeated tender offeror has no right of action for violation of § 14(e)); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (only an actual purchaser or seller of securities can maintain private action for damages under rule 10b–5).

In *Cort,* Justice Brennan writing for the panel cited four factors relevant to the determination of whether a private remedy is implicit in a statute not expressly providing one: (1) whether the plaintiff is one of the class of whose "especial" benefit the statute was enacted; (2) whether there is any indication, either explicit or implicit, of a legislative intent to create or deny such a remedy; (3) whether judicial implication is consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law. *Id.,* 422 U.S. at 78, 95 S.Ct. at 2088.

■ The four factors are guidelines for determining whether there is a need to employ the device of a private right of action to carry out the remedial objectives of the legislation. A private right of action may be implied only if it serves to advance the main purpose of the legislation. The Court in *Cort* spoke of a statute's tendency to "especially" benefit the potential plaintiff. It is not enough that the provision but incidentally aid the individual or group that is seeking to press its claim.

■ Thus, it is apparent that the reasoning of *Cort* strikes at the foundation upon which *Pearlstein I* rests. The *Pearlstein I* court premised its recognition of a private right of action on section 7's incidental purpose. Whether investor protection was an incidental purpose of the legislation or a mere byproduct, it is clear that the margin regulations were not enacted for the "especial" benefit of borrowers. Investor protection was simply not the main purpose of the legislation.

The *Cort* guidelines were applied in the securities area by the Supreme Court in *Piper v. Chris-Craft Industries, Inc., supra.* Chris-Craft, the losing tender-offeror in a battle for control of Piper Aircraft, sued the successful offeror, Bangor Punta, alleging, *inter alia,* that it had violated the Williams Act amendments to the Securities Exchange Act. The threshold question facing the court was whether a defeated tender offeror had an implied right of action on a claim that the successful bidder's section 14(e) (Williams Act amendment) violations frustrated its attempts to gain control. After a careful analysis of the anti-fraud provision bolstered by the application of *Cort* principles, the Court found that no such implied remedy should be recognized. The Court observed that section 14(e) was designed to regulate tender offerors and to protect the shareholders of the target corporation who are confronted with the decision to either tender or retain their shares. *Id.,* 430 U.S. at 26–27, 97 S.Ct. 942–43. Thus, the Court concluded that to imply a

---

**15.** The court in *Freeman* was similarly confronted with alleged margin violations that antedated the passage of section .7(f) and the promulgation of regulation X. Refusing to discuss the effect of the new regulatory provision on the holding in *Pearlstein,* the court impliedly found the *Pearlstein* doctrine intact as it related to pre-1971 transactions.

private remedy in favor of a tender offeror would not advance the purpose of the legislation and would be inconsistent with the legislative purpose since the provision was enacted for the "especial" benefit of stockholders, and not tender offerors.

The claim here is not one traditionally entertained by local law. We therefore consider only the first three factors enunciated in *Cort*. The Court's teaching in *Chris-Craft* is helpful. In *Chris-Craft* the Court observed that the Act's anti-fraud provisions were enacted for the benefit of the general investing public. On the other hand, macroeconomic objectives underlie the enactment of section 7. As our analysis of the legislative history indicates, investor protection is a mere byproduct of the margin restrictions; there is no evidence of a design to especially benefit speculators.

Turning to the second factor enunciated in *Cort*, we find the legislative record barren of any express Congressional intent to create or deny a damage remedy in favor of investors as a class. However, the fact that Congress considered the need to protect the small investor and expressly failed to provide a right of action impliedly suggests an intent to deny such relief. Moreover, the Act provides for public oversight. The scheme · contemplates Federal Reserve Board regulation of allowable credit and SEC enforcement of the Board's dictates. Criminal penalties may be imposed for non-technical violations.[16] *See e. g. United States v. Weiss-credit Banca Commerciale & D'Investimenti*, 325 F.Supp. 1384 (S.D.N. Y.1971). There is nothing that leads us to believe that the Congressionally designed administrative and penal sanctions are ineffective. Moreover, the use of extended credit to finance tender offers implicates further SEC involvement. The Commission is charged with the additional responsibility of reviewing the registration filings required by the disclosure provisions of the Williams Act. The extensive web of public enforcement procedures woven by Congress renders unnecessary any additional private weapon.

Nor can we say that a private remedy is even consistent with the legislative goals of section 7. Without extended analysis, the majority in *Pearlstein I* simply assumed that the threat of private suits would have a salutary policing effect. *Pearlstein I, supra* at 1141. But as the Supreme Court in *Chris-Craft* pointed out, the deterrent effect that massive awards may have can never be ascertained with precision. *Id.,* 430 U.S. at 39, 97 S.Ct. at 948. To state, as did the *Pearlstein I* court, that the danger of a windfall gain to an unscrupulous investor is outweighed by the deterrent impact of a potential damage award overlooks the prospects inherent in a judicially implied right of action. The borrower, if vested with the right to sue, could invest borrowed funds, await the outcome of his investment, and then attempt to shift his losses under a regulation U claim. As Judge Friendly, persuasively dissenting in *Pearlstein I*, observed, the possibility puts a borrower in an enviable no lose situation and effectively makes the lender a guarantor. The prospect of a free ride might encourage knowing investors to induce wrongful loans under the umbrella of protection afforded by a private right of action. Even where, as defendants note, the seed of a margin claim is not intentionally sewn by the borrower at the outset, to the extent that he enjoys a no lose posture, it diminishes the incentive to scrutinize his loans for margin violations. If it had been altogether clear to Susquehanna that it could not later fall back on the security of a private right of action, it may have prompted corporate officials to more closely review the terms of the credit

---

**16.** The SEC is authorized under section 21(a) of the Act, 15 U.S.C. § 78u(a), to initiate public or private investigations which serve to supplement the reports which the Federal Reserve Board may require of regulated lenders pursuant to section 17(b), 15 U.S.C. § 78q(b). *See* 12 C.F.R. §§ 221.3(j) and 220.7(d). The SEC is also empowered to commence public or private administrative proceedings or seek injunctive relief in federal court under section 21(e), 15 U.S.C. § 78u(e). In connection therewith, section 21(a), 15 U.S.C. § 78u(a) authorizes the issuance of administrative subpoenas which may, in turn, be enforced through civil or criminal contempt proceedings under section 21(c), 15 U.S.C. § 78u(c).

agreement. To now permit plaintiff to press a section 7 claim would not only fly in the face of a deterrent rationale, but in the face of Congress' desire to limit credit as well.

■ We conclude, therefore, that a private right of action to enforce the margin regulations is both inconsistent with legislative goals and "unnecessary to ensure the fulfillment of Congress' purposes" in adopting the credit limitations. *Chris-Craft, supra,* 430 U.S. at 25, 97 S.Ct. at 949. We find nothing to indicate that public enforcement through administrative and penal sanctions is ineffectual. Whatever institutional limitations exist, they do not justify judicial implication of a private damage remedy. *Drasner v. Thomsen McKinnon Securities, Inc.,* 433 F.Supp. 485 (S.D.N.Y. 1977), *citing Chris-Craft, supra,* 430 U.S. at 41, 97 S.Ct. at 949. To permit the investor to shift the risk of market fluctuations to the lender would undermine the very scheme that Congress devised to curb the flow of credit into the securities market.

We are, of course, mindful of those cases which adhere to the *Pearlstein* doctrine, even in light of the legislative changes effected by the 1970 amendments. *See e. g. Landry v. Hemphill, Noyes & Co., supra; Goldman v. Bank of the Commonwealth, supra; Palmer v. Thomas & McKinnon Auchincloss, Inc., supra; Neill v. David A. Noyes & Co., supra; Newman v. Pershing & Co., Inc., supra; Evans v. Kerbs & Co.,* 411 F.Supp. 616 (S.D.N.Y.1976); *Teitelbaum v. Scranton National Bank,* 384 F.Supp. 1139 (M.D.Pa.1974). We find, however, that *Pearlstein I* has been effectively overruled by *Cort* and *Chris-Craft.* Recently, the Supreme Court has severely restricted those instances in which a private right of action will be implied. Section 7 was enacted to accomplish · macroeconomic objectives and not for the "especial" benefit of the investing public. Since the Supreme Court has declared that tender offerors cannot find refuge in one of the Act's anti-fraud provisions, it suggests that they can neither find protection in the Act's fiscally oriented sections. Congressional intent in constructing

the regulatory scheme is clear. An implied right of action for a violation of the margin requirements would thwart legislative goals.

Accordingly, defendants' motion to dismiss is granted, and it is

SO ORDERED.

There being no just reason for delay since this court's determination turns on issues of law wholly unrelated to the remaining counterclaims, and because an immediate appeal would not prejudice claimants but would clarify the remaining issues and expedite a trial thereon, the Clerk of the court is directed to enter judgment in favor of defendants and against plaintiffs dismissing the complaint.