**Sol SIEDMAN, Plaintiff,**

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED, Defendant.**

**No. 75 Civ. 6316 (GLG).**

United States District Court, S. D. New York.

Feb. 28, 1979.

Julien, Schlesinger & Finz, P.C., New York City, for plaintiff by David Jaroslawicz, New York City, of counsel.

Brown, Wood, Ivey, Mitchell & Petty, New York City, for defendant by E. Michael Bradley, A. Robert Pietrzak, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

In this case, which has already been the subject of proceedings in this Court and extended arbitration hearings, the defendant moves for summary judgment.

As set forth in an earlier opinion of this Court, the plaintiff, Siedman, a man experienced in the brokerage field, had been a customer of Weis Securities, Inc. ("Weis") and had maintained a margin account there. Seidman was advised by Weis in May of 1973 to transfer the account to defendant, Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"). Upon opening this new account with Merrill Lynch,

plaintiff was required to enter into a "Customer's Agreement," in which he agreed to be bound by certain "Lending Agreement" provisions, one of which stipulated that the parties would arbitrate customer disputes before the New York Stock Exchange ("NYSE"). (The terms of this agreement were contained on a "Customer Agreement" card which the plaintiff signed.)

The complaint herein concerns 5,500 shares of American Home Products Company which were to be part of the transferred account. However, because a three to one stock dividend had been declared on May 11, 1973, certain clerical steps were required which delayed the transfer of these certificates. These shares never reached Merrill Lynch since Weis was placed in Securities Investor Protection Corporation receivership before the "due bill" for the securities could be cleared through the NYSE. Plaintiff pursued his SIPA (Securities Investor Protection Act) remedies and made a substantial, though not a full, recovery. A suit was then commenced against the SIPA trustees for the entire value of the shares, which was rejected by the Bankruptcy Court. (That decision was subsequently affirmed in district court.)

This action was commenced against Merrill Lynch for negligence in failing to proceed expeditiously with regard to the transfer of the entire margin account. The complaint also alleged various violations of Regulation T and rule 15c3–3(b) of the Securities and Exchange Commission and the Rules of the NYSE. Defendant in response moved to dismiss the complaint or, alternatively, to stay the action pending arbitration pursuant to the Customer Agreement. (In light of a clearly arbitrable common law claim, the question of whether plaintiff stated a federal cause of action was not then decided.) As the plaintiff denied that he had ever signed such an agreement, the matter was referred to a Magistrate who conducted an evidentiary hearing, concluding that the agreement had been signed by him. This decision was confirmed by this Court and a motion for reargument denied. Arbitration of the dispute was then directed.

Plaintiff then moved to have the arbitration take place before the American Arbitration Association, rather than the NYSE, because of the alleged bias and partiality of the latter. That application was denied in a Memorandum Endorsement of August 18, 1976.

The arbitration finally proceeded. Nine sessions of hearings were held commencing February 27, 1978 and ending June 15, 1978. On June 28, 1978, the arbitration panel awarded Siedman $134,833 on his claims, less $5,933 awarded to Merrill Lynch on a counterclaim. (Siedman was also ordered to pay over to Merrill Lynch any further amounts that he may receive from the SIPA trustee on his claim.) This Court confirmed the award on September 25, 1978.

The plaintiff contends that despite the arbitration proceedings and award he still retains valid federal securities claims which may be adjudicated by this Court. He alleges that recovery can be had for the defendant's violation of rules 412 and 255–259 of the NYSE, of rule 15c3–3(b) promulgated under section 15(c) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78(a) *et seq.*, and of Regulation T promulgated under section 7 of the Exchange Act, and asserts that an implied private right of action for damages exists under each of those provisions.

### Rules 412 and 255–259 of the New York Stock Exchange

The violation of a stock exchange rule, promulgated pursuant to section 6(b) of the Exchange Act, it has been held, does not *per se* give rise to a private right of action for damages under federal law. *Colonial Realty Corp. v. Bache*, 358 F.2d 178, 181 (2d Cir. 1966) *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966); *Schonholtz v. American Stock Exchange*, 376 F.Supp. 1089 (S.D.N.Y.1974). Rather, a court in deciding whether such right of action exists must "look to the nature of the particular rule and its place in the regulatory scheme, . . . [with] [t]he case

for implication . . . strongest when the rule imposes an explicit duty unknown to the common law." *Colonial Realty Corp. v. Bache, supra* at 182.[1] In so deciding the Court must utilize the guidelines set down in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), which require determination of:

> "First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted.' . . . that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?"

Rule 412 of the NYSE which deals with "Customer Account Transfer Contracts" provides for the coordinated transfer of accounts between the receiving and carrying brokers so that the customer suffers no loss as a result.[2] Rules 255–259 of the NYSE relate to "Due-Bills" and provide for the manner in which such bills shall be presented.[3] These rules have been promulgated by the Exchange so as to give brokers a standard of conduct to which they should adhere. While these rules arguably can be said to be primarily intended for the protection of investors (although they also would have the effect of insuring the orderly and efficient operation of the Exchange) the Court does not believe that implication of a

private right of action for violation of these rules would be appropriate. These rules do not contain the type of precise directive which the courts have found necessary in order to imply such a remedy. *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 410 F.2d 135, 141–143 (7th Cir. 1969) *cert. denied,* 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969); *Starkman v. Seroussi,* 377 F.Supp. 518 (S.D.N.Y.1974). *See Van Alen v. Dominick & Dominick, Inc.,* 560 F.2d 547 (2d Cir. 1977). Rather, as noted in *Jenny v. Shearson, Hammill & Co.* [1974–75] Fed.Sec. L.Rep. (CCH) ¶ 95,021 at 97,582 (S.D.N.Y. 1975), these rules use language "commonly associated with misconduct amounting to negligence." But implication of liability for negligence or nonfeasance is clearly contrary to the scheme of federal securities laws and the principles established in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) both of which aim to prevent deceptive, manipulative and fraudulent conduct. Action by brokers taken in violation of these NYSE rules are subject to state common law contract and negligence rules, and can be adequately remedied in such state proceedings. The Court believes that implication of a private right of action in this context would run counter to Congressional intent, *see Colonial Realty Corp. v. Bache,* 358 F.2d at 182, and would unnecessarily infringe upon an area (negligence) "traditionally relegated to state law." Accordingly, this Court declines to imply such a remedy.

### Rule 15c3–3(b)

■ The plaintiff next asserts that the defendant violated Securities and Exchange

---

1. It was noted in *Colonial* that a court should be more hesitant to imply a right of action to an exchange rule than they would be if dealing with a statute or Securities and Exchange Commission Rule. *Id.*

2. Rule 412 provides, in pertinent part:

   "Coordination of activities with respect to the account by both receiving and carrying organizations should be to the end that the customer shall not incur any loss in respect to improper execution, or failure to execute open orders, or on account of dividends of cash and securities and other similar distributions (rights, warrants, stock splits, etc.), interest, bond or preferred stock calls for redemption and tenders as a result of his account having been transferred."

3. Rule 255 is a definitional provision, defining the terms "due-bill" and "due-bill check."
   Rule 256 provides for the forms of due-bills. Rule 257 provides for deliveries after "ex" date. Rule 258 provides for the guaranty of due bills. Rule 259 provides for the redemption of due bills.

Commission rule 15c3–3(b)[4] and that damages were suffered as a result. Since rule 15c3–3(b) does not provide for a private right of action for damages it again becomes necessary for the Court to determine whether a right of action should be implied.

It has been held that a private right of action should be implied to a statute not otherwise providing for one only when implication would serve to promote the primary purpose of the legislation. *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 25, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). If such purpose is served then the availability of a private remedy may provide "a necessary supplement to Commission action." *J. I. Case Co. v. Borak*, 377 U.S. 426, 432, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964).

· No cases have been cited by the parties, nor has the Court found any, which have previously implied, or supported implication of, a private right of action to rule 15c3–3(b). Upon careful analysis the Court now concludes that implication of such a remedy would be inappropriate. Unlike rule 10b–5, *see Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), which is aimed at preventing fraud upon the customer, rule 15c3–3(b) provides a standard of conduct to be followed by a broker or dealer for the purpose of insuring the orderly operation of the exchange. While both the brokerage industry and brokerage house customers are benefitted by this provision, it is clear that the plaintiff is not as required by *Cort v.*

*Ash*, 422 U.S. at 78, 95 S.Ct. at 2088, one "for whose especial benefit the statute was enacted." Implication of a private right of action would not further the legislative scheme since it would serve to benefit individual investors and not the market as a whole. It should also be noted that rule 15c3–3(b), which utilizes such terms as "good faith" effort, aims at preventing negligent conduct, the failure to act promptly, and not the type of fraudulent conduct found necessary for implication of a right of action in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668. The remedies presently available seem adequate to insure compliance with this rule, and there appears to be no reason why the Congressional purpose would be undermined in any way by failure to allow private enforcement. The Court therefore finds that no private right of action exists for violations of rule 15c3–3(b).

### *Regulation T*

■ The Court is also presented with the question of whether the plaintiff may maintain his action against the defendant for the defendant's alleged violations of the margin requirements of Regulation T.[5] (The margin violation alleged arose only when Weis collapsed and the American Home Products securities were not delivered.) In *Pearlstein v. Scudder & German*, 429 F.2d 1136 (2d Cir. 1970) *cert. denied*, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550

---

4. Rule 15c3–3(b) provides:

   (b) Physical possession or control of securities. (1) A broker or dealer shall promptly obtain and shall thereafter maintain the physical possession or control of all fully paid securities and excess margin securities carried by a broker or dealer for the account of customers.

   (2) A broker or dealer shall not be deemed to be in violation of the provisions of subparagraph (1) of this paragraph regarding physical possession or control of customers' securities if, solely as a result of normal business operations, temporary lags occur between the time when a security is required to be in the possession or control of the broker or dealer and the time that it is placed in his physical possession or under his control, provided that the broker or dealer takes timely

steps in good faith to establish prompt physical possession or control. The burden of proof shall be on the broker or dealer to establish that the failure to obtain physical possession or control of securities carried for the account of customers as required by subparagraph (1) of this paragraph is merely temporary and solely the result of normal business operations including same day receipt and redelivery (turn-around), and to establish that he has taken timely steps in good faith to place them in his physical possession or control.

5. Regulation T promulgated under section 7 of the Exchange Act, regulates the extension of credit by brokers and dealers and provides for the minimum margin requirements which must exist at the initiation of a transaction.

(1971) it was held that an implied right of action under Regulation T existed on behalf of a customer against his broker. In reaching this conclusion the court noted that "private actions by market investors are a highly effective means of protecting the economy as a whole from margin violations." *Id.* at 1140.

Since *Pearlstein*, however, much has occurred to place the current validity of that decision into doubt. Enactment by Congress in 1970 of section 7(f) of the Exchange Act, 15 U.S.C. § 78g(f), and promulgation of Regulation X thereunder, has now established that it is unlawful for any person, whether buyer or broker, to extend or receive credit in violation of the margin requirements. As noted by the Tenth Circuit in *Utah State University of Agriculture and Applied Sciences v. Bear, Stearns & Co.*, 549 F.2d 164, 170 (10th Cir. 1977) "[t]he statement in *Pearlstein*, 429 F.2d at 1141, that 'Congress has placed the responsibility for observing margins on the broker' no longer applies."

In light of these developments the Second Circuit, after remand in *Pearlstein*, noted that "[t]he effect of these developments is to cast doubt on the continued viability of the rationale of our prior holding." *Pearlstein v. Scudder & German*, 527 F.2d 1141, 1145, n.3 (2d Cir. 1975) ("*Pearlstein II*"). The court in *Pearlstein II*, however, did not actually face the question of whether a private right of action under Regulation T existed, and thus did not have an opportunity to modify their prior holding. Other courts have reached this issue and, after some initial attempts to reconcile *Pearlstein* with Regulation X by giving *Pearlstein* a limited reading, *see e. g. Newman v. Pershing & Co., Inc.*, 412 F.Supp. 463 (S.D.N.Y. 1975), *Bell v. J. D. Winer & Co., Inc.*, 392 F.Supp. 646 (S.D.N.Y.1975), have recently held that no private right of action for damages under Regulation T exists. *Utah State University of Agriculture and Applied Sciences v. Bear, Stearns & Co.*, 549 F.2d at 170; *Establissement Tomis v. Shearson Hayden Stone, Inc.*, 459 F.Supp. 1355, 1360 (S.D.N.Y.1978); *Nussbacher v. Chase Manhattan Bank*, 444 F.Supp. 973,

980 (S.D.N.Y.1978); *Schy v. FDIC* [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,242, 465 F.Supp. 766 (E.D.N.Y.1977). *See also Drasner v. Thomson McKinnon Securities, Inc.*, 433 F.Supp. 485, 498–501 (S.D. N.Y.1977). *Contra Palmer v. Thomson & McKinnon Auchincloss, Inc.*, 427 F.Supp. 915 (D.Conn.1977).

Once more utilizing the criteria set down in *Cort v. Ash*, 422 U.S. at 78, 95 S.Ct. 2080, 45 L.Ed.2d 26, it is clear that the purpose of section 7 of the Exchange Act and Regulation T is to provide protection for the economy as a whole from excessive market speculation, and is not for the "especial benefit" of individual investors. *Utah State University of Agriculture and Applied Sciences v. Bear, Stearns & Co.*, 549 F.2d at 170 ("Congress imposed the margin requirements to protect the general economy, not to give the customer a free ride at the expense of the broker"); *Pearlstein v. Scudder & German*, 429 F.2d at 1140. This purpose would not be furthered by implication of a private right of action on behalf of an investor. Nor can the Court find any Congressional intent to provide such a remedy. As was noted by Chief Judge Mishler in *Schy v. FDIC*, [1977–78 Transfer Binder] Fed.Sec.L. Rep. (CCH) at 92,630 at 774, "the fact that Congress considered the need to protect the small investor and expressly failed to provide a right of action impliedly suggests an intent to deny such relief." *See Establissement Tomis v. Shearson Hayden Stone, Inc.*, 459 F.Supp. at 1360. And it may well be, as has been stated in *Schy* and *Establissement Tomis*, that implication of such a remedy would be inconsistent with the legislative scheme as it would serve the individual investor without benefitting the overall economy. As Judge Friendly noted in his dissent in *Pearlstein v. Scudder & German*, 429 F.2d at 1148 (Friendly, J., dissenting), such a remedy might actually have a detrimental effect on the economy as "[a]ny deterrent effect of threatened liability on the broker may well be more than offset by the inducement to violations inherent in the prospect of a free ride for the customer who, under the majority's view, is

placed in the enviable position of 'heads-I-win tails-you-lose.'" *See also Drasner v. Thomson McKinnon Securities*, 433 F.Supp. at 500.

Accordingly, it appears that no implied private right of action for damages exists to remedy violations by brokers of Regulation T.

### *The Arbitration Award*

 More significant than the legal niceties of whether plaintiff can state a federal claim is the fact that the plaintiff suffered a single wrong, has been to arbitration concerning it, and has been granted a substantial award.

Plaintiff, of course, argues that the award was not adequate and that his total recovery of approximately $470,000 (from SIPA and the defendant) is about $7,000 less than he contends his direct loss was. Moreover, he claims he is entitled to interest. The valuation of the stock transfer loss will vary depending upon the exact time chosen for pricing the stock and whether the bid or asked price is based. Whether interest is recoverable, on what is essentially a negligence claim, is another matter of serious doubt. But the plaintiff made these claims before the arbitrators and he is not free to relitigate them here. *Saxis S.S. Co. v. Multifacs International Traders, Inc.*, 375 F.2d 577, 581–82 (2d Cir. 1967).

Plaintiff also contends that his securities claims were not cognizable in arbitration. Clearly the claim of violation of the NYSE's own rules were a matter it could determine. There is also authority for the proposition that claims made under securities regulations (such as regulation T) are referable to arbitration. *Macchiavelli v. Shearson, Hammill & Co. Inc.*, 384 F.Supp. 21, 30 (E.D.Cal.1974); *Robinson v. Bache & Co.*, 227 F.Supp. 456 (S.D.N.Y.1964).

In the final analysis, plaintiff seeks to pursue these claims in this court since, as he unabashedly admits, a jury may award greater damages than did the arbitrators. His attorney graciously offers to subtract the prior award from the ultimate jury verdict. He does not, however, offer to refund any monies in the event that the jury award is less.

Plaintiff suffered a single wrong. At best, he had several legal remedies by which to vindicate that wrong. He has pursued (albeit reluctantly and under the directions of the Court) the remedy he agreed to when he entered into a relationship with the defendant. The wrong was remedied.

### *Conclusion*

None of the rules or regulations presented in the instant action would appear to provide an appropriate area in which to imply a private right of action. This is particularly so when it is considered that an agreed upon arbitration remedy was readily available, it was pursued, and a judgment resulting from it has already been obtained.

Accordingly, the defendant's motion for summary judgment is granted and the action is dismissed.